2021 IL 125617

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 125617)

ALAN BEAMAN, Appellant, v. TIM FREESMEYER *et al*., Appellees.

*Opinion filed July 29, 2021.*

JUSTICE NEVILLE delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Overstreet and Carter concurred in the judgment and opinion.

Justice Michael J. Burke dissented, with opinion, joined by Justice Garman.

Justice Theis took no part in the decision.

**OPINION**

¶ 1    In 1995, plaintiff Alan Beaman was convicted of the murder of his former girlfriend, Jennifer Lockmiller, and sentenced to a term of 50 years' imprisonment. After Beaman had served more than 13 years in prison, this court overturned his

conviction because the trial was tainted by a *Brady* violation (*Brady v. Maryland*, 373 U.S. 83 (1963)). *People v. Beaman*, 229 Ill. 2d 56, 82 (2008) (hereinafter referred to as *Beaman I*). Thereafter, the State declined to retry Beaman and dismissed the murder charge against him. Beaman subsequently initiated this action against defendants Tim Freesmeyer, Dave Warner, and Frank Zayas, former detectives of the Normal Police Department, asserting claims of malicious prosecution, intentional infliction of emotional distress, and conspiracy. Beaman also requested damages from defendant the Town of Normal, under theories of *respondeat superior* and indemnification. The circuit court of McLean County granted defendants' motion for summary judgment on all claims, and the appellate court affirmed. *Beaman v. Freesmeyer*, 2017 IL App (4th) 160527. In February 2019, this court reversed the appellate court's judgment and remanded to that court for review of "whether the defendants' conduct or actions proximately caused the commencement or continuance of the original criminal proceeding by determining whether defendants played a significant role in Beaman's prosecution." *Beaman v. Freesmeyer*, 2019 IL 122654, ¶ 47 (hereinafter referred to as *Beaman II*). On remand, the appellate court again affirmed the circuit court's entry of summary judgment for defendants. 2019 IL App (4th) 160527, ¶ 130. For the reasons that follow, we reverse the appellate court's judgment and remand the cause to the circuit court for further proceedings.

¶ 2                                  I. BACKGROUND

¶ 3                        A. The Murder and Prearrest Investigation

¶ 4      Jennifer Lockmiller, a 21-year-old student at Illinois State University, was found dead in the bedroom of her apartment in Normal, Illinois, on August 28, 1993. Her body was severely decomposed, and the electrical cord of a clock radio was wrapped and tied around her neck. She had sustained multiple stab wounds that appeared to have been made by scissors with red plastic handles, which were embedded in her chest. Her shirt and bra were pushed up around her neck, and her shorts and underwear were pulled down around her left leg. A box fan partially covered her face and was resting on the scissors in Lockmiller's chest.

¶ 5      A plastic garbage can was found lying on its side in front of the open door of the cabinet beneath the kitchen sink. A bag of trash was found on the living room

sofa. Lockmiller's closed book bags and purse were on a table and appeared undisturbed. Her wallet contained $17.71 in cash. Both the air conditioner and the television were on. Several letters were found under Lockmiller's bed.

¶ 6        In addition, seven fingerprints were recovered from the alarm clock. Eventually, it was determined that two of the fingerprints were from Beaman; four belonged to Lockmiller's then-current boyfriend, Michael Swaine; and one fingerprint was unidentified. No suitable fingerprints were found on the cord of the alarm clock or the scissors that were used to stab Lockmiller.

¶ 7        An autopsy revealed that Lockmiller died from ligature strangulation caused by the cord of the alarm clock. The medical examiner estimated the time of death between 9 a.m. on Wednesday, August 25, and 9 a.m. on Friday, August 27. He could not narrow the time frame any further due to the body's decomposition. However, the investigators narrowed down the likely time of death to the afternoon hours of Wednesday, August 25, because they had not found anyone who had seen Lockmiller alive after she attended a class that ended at 11:50 a.m. that day.

¶ 8        The murder quickly became a high-profile story in the college towns of Normal and Bloomington. The detectives from the Normal Police Department (NPD) who were involved in the investigation included defendants Freesmeyer, Warner, and Zayas. McLean County State's Attorney Charles Reynard and Assistant State's Attorney James Souk were part of the prosecutorial team.

¶ 9        Detective Zayas testified that the murder could have been committed by a large universe of potential suspects, given the transient nature of the campus, with young people attending activities and parties at all hours of the day and night and the location of the crime scene on a main throughfare, Route 51. According to Zayas, it was an open case, and the detectives had no idea where to begin the investigation.

¶ 10       However, since there was no sign of forced entry and it appeared nothing had been stolen, the investigation immediately focused on men Lockmiller had dated. Believing the murder was a crime of passion, the detectives questioned several of Lockmiller's current and former boyfriends, including Beaman, Michael Swaine, Stacey "Bubba" Gates, and Larbi John Murray.

¶ 11    Swaine was Beaman's former roommate and Lockmiller's boyfriend at the time of her murder. Swaine had a sexual relationship with Lockmiller beginning while she was still dating Beaman during June 1993 and continuing until her death. Though Swaine and Lockmiller tried to hide it from Beaman, he learned of their relationship in mid-July 1993 when he broke down the door to Lockmiller's apartment and found them together. Although Beaman was angry, he never touched either Swaine or Lockmiller, and he later drove Swaine back to their apartment.

¶ 12    On July 25, 1993, Beaman found two letters from Lockmiller in Swaine's bedroom and went to the theater where he and Swaine worked to confront him about his relationship with Lockmiller. Later that day, Beaman went with a friend to Ohio so he could disengage from his relationship with Lockmiller. At around that time, Lockmiller told Swaine that Beaman was over her and did not love her anymore. According to Swaine, when Beaman returned from Ohio on August 4, he seemed to be in a better place emotionally. Swaine was eliminated as a suspect based on the results of his polygraph examination and on evidence that he was working at his former high school's bookstore in Elmhurst, Illinois, on the day of the murder.

¶ 13    Stacey "Bubba" Gates, a former boyfriend of Lockmiller's, moved to Peoria, Illinois, from Janesville, Wisconsin, three days before her murder. He and Lockmiller planned to get together the following weekend, and he believed they were going to renew their relationship. Gates gave erratic and inconsistent answers during his polygraph examination but was eliminated as a suspect because check-in logs from a Peoria school showed that he was working as a teacher on August 25, 1993.

¶ 14    Larbi John Murray was a drug dealer with connections to a major supplier in Chicago, and he previously had sold drugs to Lockmiller. At the time of her death, Lockmiller owed Murray about $20 for the purchase of marijuana. In addition, Murray had a sporadic sexual relationship with Lockmiller. At the time of the murder, he lived in Bloomington, about 1½ miles from Lockmiller's apartment.

¶ 15    During his initial interview, Murray informed the investigators that he had spoken with Lockmiller and Swaine in a parking lot sometime between August 19 and 23, 1993. He also said he left Bloomington and went to Byron, Illinois, on August 24 and did not return until September 1. Murray further told the detectives

that he and Lockmiller were about to renew their sexual relationship. In addition, Murray stated that Lockmiller said she had been afraid to end her relationship with Beaman.

¶ 16    The investigators later spoke with Murray's live-in girlfriend, Debbie Mackoway, who said she was with Murray after she returned from work at 2 p.m. on August 25 until 4:20 p.m., when Murray left town. Mackoway corroborated Murray's statement that he had returned to Bloomington on September 1. Mackoway further stated that she last saw Lockmiller with Swaine on August 21 and that she believed the same was true for Murray.

¶ 17    After interviewing Mackoway, investigators again spoke with Murray, who changed the information that he had provided earlier. At his second interview, Murray admitted that he was home during the morning and early afternoon of August 25 and indicated that he was with Mackoway from 1 to 4 p.m., when he left for Byron. This information was confirmed by Murray's telephone records, which showed that he was in Bloomington on August 25. Murray also admitted that he previously had a physical altercation with a former girlfriend.

¶ 18    Detective Daniels escorted Murray for a polygraph examination, but the examiner was unable to get a valid result because Murray repeatedly failed to follow directions despite being instructed numerous times. Murray told the examiner that he was not able to comply, and the examiner ultimately terminated the examination. Though the examiner did not initially conclude that Murray had intentionally prevented a valid result, he later acknowledged that lack of cooperation could be an intentional response. Another polygraph examination was scheduled for October 12, 1993, but Murray never appeared for that examination.

¶ 19    Detective Warner received the report regarding Murray's incomplete polygraph, but what happened to the report after that is unclear. Warner testified that he gave the report to Daniels, but Daniels had no memory of ever receiving it. It is clear, however, that neither the State Attorney's Office nor Beaman's counsel ever received that report.

¶ 20    Early on, the detectives became aware that Murray had been the subject of prior police investigations that were related to his drug dealing, use of steroids, and abusive and erratic behavior. In January 1993, cocaine and steroids were found in

Murray's apartment during a police search, and he admitted to having used steroids on several occasions. At that time, Murray faced charges of possessing drugs with intent to deliver.

¶ 21 On the day Lockmiller's body was found, the detectives began to focus the investigation on Beaman based, in part, on information received from Lockmiller's friend, Morgan Keefe. Keefe had attempted to contact Lockmiller for several days and eventually went to her apartment, where she found Lockmiller's body. Keefe called the police and said she knew "who did it," referring to Beaman. She also informed investigators that Lockmiller had been afraid of Beaman because he previously had broken down her door. Keefe admitted, however, that she had no personal knowledge about who committed the murder.

¶ 22 The investigators learned that Beaman, a student at Illinois Wesleyan University in Bloomington, was residing with his parents in Rockford during the week of Lockmiller's murder. Beaman occasionally sang and played guitar and saxophone for his church while home from college. Beaman and his church pastor arranged that they would rehearse on Wednesday, August 25, for the performance the following Sunday.

¶ 23 The detectives also learned that Beaman and Lockmiller began a tumultuous relationship in July 1992 and that the two had broken up and rekindled their relationship approximately 17 times over the next 12 months. They had a history of engaging in loud arguments, one of which ended when Beaman drank nail polish remover and Lockmiller took him to the hospital. Beaman wrote letters to Lockmiller stating that he wanted their relationship to be monogamous, but he suspected she was seeing other men. The relationship finally ended in late July 1993, a month prior to the murder, and Beaman subsequently started a new relationship.

¶ 24 The night Lockmiller's body was found, Daniels and another detective drove to Rockford and questioned Beaman at the Rockford police headquarters at around 11:30 p.m. The interview focused on Beaman's relationship with Lockmiller and his activities over the previous seven days. Beaman told Daniels that he had worked every night that week from 1 to 9 a.m. and that he had attended parties on Wednesday and Thursday evenings before going to work. As to Wednesday,

August 25, Beaman said that after getting off work on that morning he went home and slept until he woke up in the evening to have dinner with his parents.

¶ 25    Beaman informed the investigators that, after confronting Swaine regarding his relationship with Lockmiller, he left Bloomington on July 25 and went to Ohio, where he stayed with a friend until August 4. Upon returning to Bloomington, Beaman visited Lockmiller at her apartment and then drove her to class. He told the investigators they parted amicably and that was the last time he had seen her. He further stated that he had not called Lockmiller since leaving Bloomington.

¶ 26    The investigative team obtained telephone records for Lockmiller, Beaman, Swaine, and Murray. Those records established that on August 22, three days before her murder, Lockmiller called the Beaman residence in Rockford 28 times. Each of those calls lasted only a few seconds and appeared to have been unanswered. Another call by Lockmiller to the Beaman residence the following day lasted several minutes. The telephone records also established that two calls were made from the Beaman residence to his church pastor at 10:37 and 10:39 a.m. on the day of the murder.

¶ 27    In early September 1993, Freesmeyer traveled to Rockford and interviewed Beaman's neighbor, Michael VanBerringer, who had spoken with Beaman in the early morning of August 29, when Beaman returned from being questioned by the detectives. VanBerringer reported that Beaman said they were trying to ascertain his whereabouts during the previous week. Beaman also said he had a receipt for new tires, purchased on August 24, which reflected the milage on his car and would show that he could not have driven to Bloomington after the tires were purchased.

¶ 28    Freesmeyer also learned that Beaman had made a deposit at Bell Federal Savings and Loan on the day of the murder, and security footage from the bank showed Beaman entering the building at 10:09 a.m. and leaving two minutes later. In addition, Freesmeyer documented in his investigative report that "the only person able to verify Alan's alibi during the time that the homicide occurred, was his mother, Carol Beaman."

¶ 29    Freesmeyer questioned Beaman on October 27, 1993. During that interview, Freesmeyer told Beaman that he was going to be arrested for Lockmiller's murder, stating that probable cause for an arrest already existed and that the detectives were

simply waiting for lab results. Freesmeyer informed Beaman that he had a video tape showing him at the bank at 10:11, which conflicted with Beaman's prior statement that he went straight home after work. Freesmeyer also informed Beaman that his fingerprint was found on the "murder weapon" and that the State would not seek the death penalty if Beaman chose to confess now but that, "if this façade continues, we're going for the death penalty." Beaman denied any involvement in the murder.

¶ 30       After that interview, the detectives obtained court permission to secretly record the meetings between Beaman and Freesmeyer. In addition, Swaine had multiple conversations with Beaman while wearing a concealed recording device. During those secretly recorded conversations with Swaine, Beaman consistently stated that he had no information about the identity of Lockmiller's murderer. He also told Swaine that Lockmiller had called requesting to resume their prior relationship, but he refused and told her that he did not love her.

¶ 31       Freesmeyer later met with Beaman and asked if there was anything about his car that would tend to show his innocence. Beaman responded that he had new tires installed on August 24 and the receipt showed the mileage on his car at that time. Freesmeyer also asked Beaman if he had ever searched through Lockmiller's garbage, and Beaman said he had done so when he felt he had a reason.

¶ 32       Early in the investigation, detectives interviewed David Singley, Lockmiller's neighbor. Singley informed investigators that he arrived home from class at about 2 p.m. on August 25 and heard Lockmiller's door slam shut. Singley also said that he heard the stereo playing inside Lockmiller's apartment and that the window air conditioner was off. About five minutes later he heard Lockmiller's door open and close, followed by the sound of someone running down the stairs and exiting the building. Singley left his apartment soon thereafter and returned around 4:30 p.m. When he again left the apartment around 5:15 p.m., he noticed that Lockmiller's air conditioner was running, the stereo was turned off, and the television was on.

¶ 33       In November 1993, Freesmeyer sought to verify Swaine's alibi by conducting driving time trials between his residence in Elmhurst and Lockmiller's apartment in Normal. Freesmeyer determined that those time trials and Swaine's telephone records eliminated his opportunity to commit the murder.

¶ 34    In February 1994, John Dierker, a forensic scientist with the Illinois State Police, informed Freesmeyer that he had found a latent palm print on the kitchen garbage bag retrieved from the crime scene. Dierker advised Freesmeyer that, if he had a palm print of Beaman's, he could compare it with the latent print on the bag. Beaman voluntarily submitted additional palm prints, but they did not match the print on the garbage bag.

¶ 35    In April 1994, Daniels attended a national police conference in Florida on "cold case" investigations. He presented the Lockmiller case at the conference and obtained a list of possible leads the investigators could pursue.

¶ 36    On May 16, 1994, a meeting was held to determine whether to arrest Beaman for Lockmiller's murder. Those in attendance included State's Attorney Reynard, Assistant State's Attorney Souk, and Detectives Freesmeyer, Zayas, and Daniels. During the meeting, Reynard decided to charge Beaman, and Souk agreed. Daniels attempted to present the suggested list of investigative leads they could pursue prior to arresting Beaman, but Souk responded, "I think we've got our guy" and stated, "we went as far as we can with this case." Souk stated they would issue a warrant for Beaman's arrest, and the arrest was made the following day.

¶ 37                              B. Postarrest Investigation

¶ 38    On May 18, 1994, the day after Beaman's arrest, his parents were interviewed for the first time. Sometime in June, Freesmeyer received a call from Mrs. Beaman, who indicated that she had found receipts from August 25, 1993, that substantiated her statement that she returned from shopping by 2:15 p.m., the time at which she saw Beaman's car in the driveway.

¶ 39    In late June, Freesmeyer performed driving time trials from the bank to the Beaman residence to determine whether Beaman could have made the two telephone calls to the church at 10:37 and 10:39 a.m. During numerous driving time trials, Freesmeyer observed the speed limit at all times. One of those trials indicated that use of a bypass route would have allowed Beaman to return home from the bank in time to make the calls to the church. This was the only time trial that Freesmeyer omitted from his report. Freesmeyer also performed a separate time trial from the bank to Lockmiller's apartment and then back to the Beaman

residence, which took a total drive time of 4 hours and 11 minutes, driving at the speed limit for that round trip.

¶ 40                              C. Grand Jury Proceedings

¶ 41    In July 1994, proceedings on Lockmiller's murder were held before the grand jury. Souk conducted the questioning. During Freesmeyer's testimony, the following inquiry occurred:

> "Q. But other than Mr. Beaman, were you able in the course of your investigation to locate any other person anywhere who had any conceivable motive to kill Jennifer Lockmiller?
>
> A. No, not necessarily."

Freesmeyer was also asked whether his interviews of residents of the apartment building revealed anything helpful to the case, and he responded they did not.

¶ 42    Freesmeyer also explained that he had obtained information that a woman and her husband had arranged to meet Lockmiller at her apartment on the afternoon of Wednesday, August 25, because she had advertised kittens for sale. However, when the couple went to Lockmiller's apartment at about 4:20 p.m., she did not answer the door.

¶ 43    During Mrs. Beaman's grand jury testimony, she stated that a week prior to the hearing she had given Freesmeyer copies of her shopping receipts from August 25, 1993. She also explained that she took her mother for medical tests that morning and they stopped for a late breakfast afterward. Mrs. Beaman testified that she dropped her mother off sometime after 10:30 a.m. and immediately went to the Walmart directly across from her mother's apartment and that the receipt showed she checked out at 11:10 a.m. Thereafter, she went to a nearby discount store and checked out at 12:39 p.m. She then went grocery shopping, checked out about 2:03 p.m., and drove directly home to put away the perishable grocery items. Mrs. Beaman testified that she arrived home at about 2:15 p.m. and saw her son's car parked in the driveway.

¶ 44 Freesmeyer posited an alternative to Mrs. Beaman's version of events by suggesting that, if she left her mother's residence at 10 a.m., she would have been home by 10:17. In that event, she could have made the telephone calls to the church at 10:37 and 10:39 and then driven back to Walmart, arriving by 10:57 or 11 a.m. According to Freesmeyer, that scenario would have given Mrs. Beaman 10 minutes to shop in three different departments at Walmart and check out by 11:10 a.m., the time reflected on her receipt. Freesmeyer expressed his opinion that it would have been rushed but it would be possible.

¶ 45 The grand jury returned a true bill against Beaman for the murder of Lockmiller.

¶ 46 D. Investigation After Grand Jury Proceedings

¶ 47 In October 1994, Murray had two felony drug charges brought against him, as well as a misdemeanor domestic battery charge, which was based on a complaint by Mackoway. Mackoway informed the investigators of prior arguments and physical abuse by Murray, including his elbowing her in the chest repeatedly. This report led to Murray's arrest and issuance of an order of protection. Mackoway also indicated that Murray had been experimenting with steroid use, which made his behavior erratic. Freesmeyer was the detective who signed the reports regarding Murray's arrest on the domestic violence charge.

¶ 48 In January 1995, Freesmeyer began working out of the State's Attorney's Office to assist with preparation for trial. During that month, Freesmeyer conducted additional driving time trials, which showed that Beaman could have arrived at Lockmiller's apartment just before noon if he left from the bank at 10:11 a.m. and drove at an average speed of 75 miles per hour. Those time trials also indicated that Beaman could have returned home from Lockmiller's apartment in just under two hours, again driving at an average speed of 75 miles per hour.

¶ 49 E. The State's Motion *In Limine*

¶ 50 Before trial, Souk filed a motion *in limine* seeking to exclude reference to Lockmiller's sexual relationships with anyone other than Beaman and Swaine. At a hearing on this motion, Souk told the court that the State had no evidence that any

- 11 -

other person could have committed the crime, including Murray. The circuit court granted the State's motion.

¶ 51                        F. The State's Theory at Trial

¶ 52        According to the State, Beaman's motive for the murder was his aberrant obsession with Lockmiller. In the State's view, a phone call from Lockmiller renewed Beaman's hope of rekindling their relationship, but he flew into a jealous rage when he saw Swaine's belongings in her apartment. The State's theory as to Beaman's opportunity was that he left the bank at 10:11 a.m. and drove 124 miles to Normal, averaging 75 miles per hour, to surprise Lockmiller. According to the State, Beaman did not plan to kill her, but something went wrong, and he snapped. The State posited that, after strangling Lockmiller with the cord from her clock radio and stabbing her multiple times with scissors, Beaman then arranged her clothes to suggest she had been sexually assaulted. According to the State, he also took the kitchen garbage can out and searched through the garbage bag for evidence of her sexual activities. In the State's view, Beaman left the apartment by 12:15 p.m., drove home at an average speed of 75 miles per hour, and arrived there five minutes before his mother returned from shopping.

¶ 53                        G. Conviction and Appeal

¶ 54        A jury found Beaman guilty of Lockmiller's murder, and he was sentenced to 50 years' imprisonment. Beaman's conviction was affirmed on direct appeal, with one justice dissenting. *People v. Beaman*, 279 Ill. App. 3d 1115 (1996) (table) (unpublished order under Illinois Supreme Court Rule 23).

¶ 55        Shortly after Beaman was convicted, Souk sent a letter to the chief of the NPD crediting Freesmeyer's work on the case. That letter stated, in part, that Freesmeyer's effort was "all the more remarkable considering his relative youth and inexperience. His recent promotion indicates you are already aware of his exceptional ability ***. Beyond any question in my mind, this case would not have been won without Tim Freesmeyer."

¶ 56                                    H. Postconviction Proceedings

¶ 57        In April 1997, Beaman filed a petition for postconviction relief alleging that the State violated his right to due process by failing to disclose material information as to Murray's viability as a suspect. After an evidentiary hearing, the circuit court denied Beaman's petition. The appellate court affirmed, with one justice dissenting. *People v. Beaman*, 368 Ill. App. 3d 759, 772 (2006).

¶ 58        In May 2008, this court found that Beaman's murder trial was unconstitutionally tainted in violation of *Brady*, 373 U.S. 83, because the State failed to disclose material exculpatory evidence pertaining to Murray. *Beaman I*, 229 Ill. 2d at 81. The undisclosed evidence included Murray's (1) failure to complete the polygraph examination, (2) charge of domestic battery and possession of marijuana with intent to deliver prior to Beaman's trial, (3) physical abuse of his girlfriend on numerous occasions, and (4) use of steroids, which caused him to act erratically. *Id.* at 74.

¶ 59        Upon review of that undisclosed evidence, this court determined that "[w]e cannot have confidence in the verdict finding [Beaman] guilty of this crime given the tenuous nature of the circumstantial evidence against him, along with the nondisclosure of critical evidence that would have countered the State's argument that all other potential suspects had been eliminated from consideration." *Id.* at 81. We, therefore, reversed the denial of Beaman's postconviction petition, vacated his murder conviction, and remanded to the circuit court for further proceedings. *Beaman I*, 229 Ill. 2d at 81-82.

¶ 60        On remand, the State declined to retry Beaman and dismissed the charge against him. Beaman was released from prison in June 2008 and subsequently petitioned for a certificate of innocence. After receiving DNA test results that excluded Beaman as a suspect, the State withdrew its opposition to his petition. On April 29, 2013, the circuit court of McLean County issued Beaman a certificate of innocence. On January 9, 2015, then-Governor Pat Quinn granted Beaman a pardon "Based Upon Innocence As If No Conviction."

¶ 61                                          I. Beaman's Civil Action

¶ 62        In April 2014, Beaman filed this action against defendants Freesmeyer, Warner, Zayas, and the Town of Normal. Beaman's complaint alleged malicious prosecution, intentional infliction of emotional distress, and civil conspiracy against the individual defendants and sought damages from the Town of Normal based on theories of *respondeat superior* and indemnification.[1] In his complaint, Beaman alleged the three individual defendants played significant roles in his wrongful prosecution and conviction.

¶ 63        Defendants moved for summary judgment maintaining that no evidence established a genuine issue of material fact on four of the five elements of malicious prosecution. Defendants contended that they were entitled to judgment as a matter of law on the malicious prosecution claim and the remaining claims that were predicated on the contention that Beaman had been maliciously prosecuted.

¶ 64        In June 2016, the circuit court granted defendants' motion for summary judgment. The court found that the prosecutors, not the detectives, made the decision to prosecute Beaman and noted that the evidence presented at Beaman's trial was sufficient to prove his guilt beyond a reasonable doubt. The circuit court determined that defendants "did not exert any unusual influence on the prosecutors which caused a malicious prosecution to take place against [Beaman]." The circuit court also entered judgment for defendants on the remaining claims, finding that they were dependent on the malicious prosecution claim.

¶ 65        The appellate court affirmed the grant of summary judgment on the "commencement or continuance" element of malicious prosecution but did not address the other grounds cited by the circuit court to justify its judgment on that claim. *Beaman*, 2017 IL App (4th) 160527, ¶ 58. We allowed Beaman's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. July 1, 2017).

---

[1]Beaman previously filed a federal action under section 1983 of title 42 of the United States Code (42 U.S.C. § 1983 (2006)) seeking recovery from defendants and the prosecutors of his criminal trial. The district court dismissed Beaman's claims against certain defendants and granted summary judgment in favor of the remaining defendants. The United States Court of Appeals for the Seventh Circuit affirmed. *Beaman v. Freesmeyer*, 776 F.3d 500 (7th Cir. 2015).

¶ 66        In February 2019, this court held that the appellate court's review was improperly limited. Accordingly, we remanded to the appellate court with directions to determine whether the defendants' conduct proximately caused the commencement or continuance of the original criminal proceeding by determining whether defendants played a significant role in Beaman's prosecution. *Beaman II*, 2019 IL 122654, ¶ 47.

¶ 67        On remand, the appellate court again affirmed, holding that summary judgment for defendants was proper because Beaman could not establish the absence of probable cause element of malicious prosecution. 2019 IL App (4th) 160527, ¶¶ 76-81. In addressing the "significant role" test, the appellate court interpreted this court's opinion to require examination of whether the defendants engaged in "wrongful or bad-faith conduct that overcame prosecutorial independence" and noted that "[a] prosecutor's decision to commence or continue suit breaks the causal chain, absent some conduct, as defined in the significant-role assessment, on behalf of an officer." *Id.* ¶ 90. The appellate court ultimately held that there was no evidence from which a reasonable juror could find that Freesmeyer, Warner, or Zayas provided false information to the prosecutors or exerted influence on the decision to prosecute Beaman. *Id.* ¶¶ 100-20.

¶ 68        We granted Beaman's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Oct. 1, 2019). We also allowed The Innocence Network, the Illinois Fraternal Order of Police Labor Council, Illinois Fraternal Order of Police, Illinois Troopers Lodge No. 41, and Chicago Fraternal Order of Police Lodge No. 7 to file *amicus curiae* briefs. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).


¶ 69                                              II. ANALYSIS

¶ 70                            A. Summary Judgment and Standard of Review

¶ 71        Beaman again argues to this court that the circuit and appellate courts erred in concluding, as a matter of law, that he could not prevail on his claims for malicious prosecution, intentional infliction of emotional distress, and civil conspiracy or on his claims for damages premised on theories of *respondeat superior* and indemnification.

¶ 72        Summary judgment is proper when the "pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2016). Summary judgment is a drastic means of disposing of litigation and should be allowed only when the right of the moving party is clear and free from doubt. *Seymour v. Collins*, 2015 IL 118432, ¶ 42; *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 43 (2004). Where a reasonable person could draw divergent inferences from the undisputed material facts or where there is a dispute as to a material fact, summary judgment should be denied and the issue decided by the trier of fact. *Seymour*, 2015 IL 118432, ¶ 42; *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 114 (1995). In ruling on a motion for summary judgment, we must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the nonmoving party. *Seymour*, 2015 IL 118432, ¶ 42; *Adams*, 211 Ill. 2d at 43. We review an appeal from a ruling on a motion for summary judgment *de novo*. *Seymour*, 2015 IL 118432, ¶ 42; *Raintree Homes, Inc. v. Village of Long Grove*, 209 Ill. 2d 248, 254 (2004).

¶ 73                        B. General Principles of Malicious Prosecution

¶ 74        As set forth in our 2019 decision in this case,

           "[t]o state a cause of action for the tort of malicious prosecution, the plaintiff must prove five elements: (1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." (Internal quotation marks omitted.) *Beaman II*, 2019 IL 122654, ¶ 26.

       The absence of any of these elements will preclude a plaintiff from recovering on a claim for malicious prosecution. *Id.* (citing *Swick v. Liautaud*, 169 Ill. 2d 504, 512 (1996)).

¶ 75                    C. Consideration of Summary Judgment as to Each Element

¶ 76        In reviewing the entry of summary judgment for defendants, we consider whether Beaman has presented sufficient evidence to create a genuine issue of material fact as to each of the elements set forth above. We note that, although the appellate court did not address the parties' arguments pertaining to the elements of favorable termination or malice, those issues have been fully briefed in this court. Given that this is the second time we have considered the viability of Beaman's claims and that the underlying facts occurred 28 years ago, we believe it would best serve the interests of justice and judicial economy for us to decide those issues without further remand.

¶ 77                            1. The Commence or Continue Element

¶ 78        We begin by considering Beaman's assertion that the lower courts erred in holding, as a matter of law, that he could not prove the first element of his malicious prosecution claim—that the defendant detectives commenced or continued the criminal prosecution against him. Beaman contends that the evidentiary materials submitted to the trial court are sufficient to create a genuine issue of material fact on this element. We agree.

¶ 79        *Beaman II* explained that, in evaluating the first element of a malicious prosecution claim, the relevant inquiry is whether the officer proximately caused the commencement or continuance of the criminal proceeding. *Beaman II*, 2019 IL 122654, ¶ 33. We noted that "liability for malicious prosecution 'extends to all persons who played a significant role in causing the prosecution of the plaintiff, provided all of the elements of the tort are present.' " *Id.* ¶ 43 (quoting *Frye v. O'Neill*, 166 Ill. App. 3d 963, 975 (1988)); see also *Rodgers v. Peoples Gas, Light & Coke Co.*, 315 Ill. App. 3d 340, 348-49 (2000). We held that the significant-role determination must include "those persons who improperly exerted pressure on the prosecutor, knowingly provided misinformation to him or her, concealed exculpatory evidence, or otherwise engaged in wrongful or bad-faith conduct" that was instrumental in the commencement or continuation of the criminal prosecution. (Internal quotation marks omitted.) *Beaman II*, 2019 IL 122654, ¶ 45.

¶ 80	Ultimately, we concluded that the appellate court incorrectly limited the standard for this element by holding that Beaman was required to establish that the detectives pressured or exerted influence on the prosecutors' decision or made misstatements upon which they relied. We remanded with directions that the appellate court consider whether defendants' conduct proximately caused the commencement or continuance of the criminal proceeding by determining whether defendants played a significant role in Beaman's murder prosecution. *Id.* ¶ 47.

¶ 81	On remand, the appellate court again affirmed the grant of summary judgment for defendants, holding, in part, that Beaman could not establish they had proximately caused his criminal prosecution because a prosecutor's decision to commence or continue suit breaks the causal chain. 2019 IL App (4th) 160527, ¶¶ 90, 100. The appellate court noted that in this case the prosecutors, Reynard and Souk, made the decision to charge and prosecute Beaman. *Id.* ¶ 100.

¶ 82	However, the appellate court's judgment does not answer the critical question as to defendants' potential liability, given that prosecutors make the final decision to prosecute in every felony case. See 725 ILCS 5/111-2(a), (b), 111-3(b) (West 2016). If it were true that only those who make final felony charging decisions could be held liable for malicious prosecution, then no person who has been maliciously prosecuted for a felony would be able to pursue a claim against the responsible investigators.

¶ 83	We held in *Beaman II* that prosecutorial decisions about whom to charge with a crime are heavily influenced by the manner in which investigations are conducted, and it is customary for prosecutors to defer to the investigative duties of the police. *Beaman II*, 2019 IL 122654, ¶ 43 (citing *People v. Ringland*, 2017 IL 119484, ¶ 24). Thus, prosecutors are greatly dependent on the detectives assigned to a particular case and must be able to rely on their fidelity to the objective principles that ought to guide the handling of an investigation. It is inescapable that the independent judgment of a prosecutor will be colored by the nature of the investigation performed by the police.

¶ 84	In addition, the rule that a prosecutor's independent decision to commence or continue a criminal action "breaks the causal chain" only applies *in the absence* of a police officer's conduct that satisfies the significant-role assessment. See *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988). The "causal-chain" rule

necessarily assumes that the prosecutor has received a full and fair report detailing a complete good-faith investigation intended to ascertain the identity of the person responsible for the crime. Where, however, an investigative team conducts a bad-faith and incomplete investigation—designed to implicate a particular individual regardless of the evidence—the prosecutor is effectively prevented from fully exercising that independent judgment. As the United States Court of Appeals for the Seventh Circuit recognized in *Jones*, "a prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced [that] decision." *Id.* at 994.

¶ 85　　Beaman contends that a rational juror could conclude that defendants' bad-faith conduct was a proximate cause of the malicious prosecution, where both cause in fact and legal cause are supported by the record.

¶ 86　　With regard to cause in fact, Souk's letter praising Freesmeyer's actions during the investigation suggested that his conduct was a "but for" cause by stating that Beaman's conviction could not have been achieved "without Tim Freesmeyer." As to the issue of legal cause, Beaman argues that the malicious prosecution and his wrongful conviction were the foreseeable results of defendants' conduct.

¶ 87　　Beaman presented evidence supporting his assertion that defendants acted deliberately to conceal exculpatory evidence from the prosecutors and misrepresented other material evidence that was likely to influence the decisions to initiate and continue the prosecution against him. Therefore, the fact that the prosecutors made the ultimate decision to pursue the criminal proceeding does not automatically insulate defendants from liability. The appellate court did not fully address whether the prosecutors' independent judgment was "overcome" in the sense that it was thwarted at the outset.

¶ 88　　In support of his assertion that defendants engaged in wrongful or bad-faith conduct that was instrumental in the commencement or continuation of his criminal prosecution, Beaman relies on evidentiary material presented in the record of the investigation, the grand jury proceedings, the murder trial, subsequent deposition testimony, and reports by expert witnesses. That evidence falls into four general categories: (a) bad-faith investigation, (b) concealment of exculpatory evidence, (c) misleading information during grand jury proceedings, and (d) knowingly

providing misinformation to the prosecutor. We consider each category in turn.

¶ 89                          (a) Bad-Faith Investigation

¶ 90        Beaman argues that defendants engaged in a bad-faith investigation that immediately focused on him as the primary suspect, which deliberately limited the scope of the inquiry and disregarded or discounted other suspects and plausible motivations for the crime. As a result, the detectives opted not to pursue other avenues of investigation that would have included interviewing Lockmiller's classmates as well as the employees and customers of the local bars and businesses she frequented. In support, Beaman points to evidence in the record that the investigators prematurely concluded that Lockmiller was killed by an intimate partner who was in a jealous rage.

¶ 91        In Beaman's view, by intentionally creating the "jealous rage" explanation for the murder, the investigators prematurely moved from an evidence-based investigation to a suspect-based investigation that focused primarily on him. Beaman points out that there was no persuasive eyewitness evidence indicating that he had been in Normal on the day of the murder, and he consistently denied any involvement in the crime. Also, aside from two fingerprints on Lockmiller's clock radio, there was no physical evidence that linked Beaman to the crime. None of his fingerprints were on the cord of the clock radio—which was the actual murder weapon—nor were any of his fingerprints on the scissors, the garbage can, or the miscellaneous items from the garbage that were found scattered about the apartment.

¶ 92        In addition, the "jealous rage" theory adopted by the detectives was countered by Swaine's statements that Beaman went to Ohio at the end of July to disengage from his relationship with Lockmiller and that Lockmiller told him Beaman did not love her anymore. Also, Beaman told Swaine that Lockmiller had called him requesting to resume their prior relationship but that he refused and told her that he did not love her. This statement was consistent with telephone records reflecting that three days before the murder there were 28 calls made from Lockmiller's telephone number to Beaman's. All of those calls were extremely short and appeared to have been unanswered. Freesmeyer interpreted these telephone calls as evidence of Beaman's "intense obsession" with Lockmiller and suggestive of his

guilt. However, the telephone records showed that Lockmiller was calling Beaman—not the other way around. This undisputed evidence controverted the dominant hypothesis of the investigation—that Beaman had murdered Lockmiller in a jealous rage.

¶ 93 Moreover, the detectives did not credit the information obtained from David Singley, Lockmiller's neighbor, who told the investigators that when he entered the apartment building at approximately 2 p.m. on the day of the murder he heard the door to Lockmiller's apartment open and close quickly. At that time, Singley also heard the stereo in Lockmiller's apartment and noticed that the window air-conditioning unit was not running. Shortly after Singley entered his apartment, he heard the door to Lockmiller's apartment slam shut and someone leave quickly. Singley left his apartment a while later and returned around 4:30 p.m. When he left the apartment again at about 5:15 p.m., Singley noticed that Lockmiller's air conditioner was running, the stereo was turned off, and the television in her apartment was on. This information from Singley indicates that Lockmiller may have been murdered sometime after 12:15 p.m. on August 25, which would exclude Beaman as a suspect. Singley's statement that Lockmiller's television remained on from Wednesday, August 25, until her body was discovered on Saturday, August 28 is consistent with what the detectives found at the scene. Yet, the detectives discounted Singley's information because he was either mistaken or unclear as to other details pertaining to the investigation such as the presence of Swaine's car in the apartment building parking lot during the week of Lockmiller's murder.

¶ 94 On October 27, 1993, Freesmeyer contacted Beaman and told him that his fingerprint had been found on the "murder weapon," that he was going to be arrested for Lockmiller's murder, and that the State was going to seek the death penalty if he did not confess. In the face of this coercive questioning, Beaman repeatedly denied responsibility for the crime. Although much of the necessary investigation had not been completed, Freesmeyer concluded within eight weeks of the murder that Beaman was guilty.

¶ 95 Beaman also highlights the fact that the detectives discounted the fact that Murray was a more viable suspect because he had previously been involved in a sexual relationship with Lockmiller, who was interested in resuming their prior relationship; he had supplied her with drugs and was owed money by her; he had

- 21 -

no alibi for the time of the murder and lived a short distance from Lockmiller's apartment; he had been taking steroids, which may have caused erratic behavior; he had been charged with domestic violence for physically abusing his girlfriend; and his polygraph results were inconclusive because he did not comply with the polygraph examiner's directions and failed to return for another examination.

¶ 96    Beaman contends that a rational juror could conclude that defendants were not motivated by a desire to bring the true perpetrator to justice but, rather, by the improper purpose of convicting him of the murder, regardless of the evidence. And as to Freesmeyer in particular, Beaman asserts that a juror could determine that he was motivated by a desire to advance his career. In support, Beaman points to Souk's letter praising Freesmeyer's performance during the murder investigation. That letter referenced Freesmeyer's recent promotion, characterized his efforts as "all the more remarkable considering his relative youth and inexperience," and stated that "this case would not have been won without Tim Freesmeyer."

¶ 97    (b) Concealment of Exculpatory Evidence

¶ 98    Beaman further argues that a rational juror could conclude that defendants acted in bad faith by concealing the Murray polygraph report. The appellate court agreed but determined that the report added "little if anything to the prosecution's existing knowledge of Murray." 2019 IL App (4th) 160527, ¶¶ 110, 116. This court's 2008 decision reached the opposite conclusion as to the significance of Murray's polygraph. In holding that Beaman was entitled to a new trial due to the *Brady* violation, we specifically observed that "the circumstances of the polygraph examination indicate that [Murray] intentionally avoided the test. He did not comply with the polygraph examiner's instructions during the first attempt and failed to cooperate in scheduling a second attempt." *Beaman I*, 229 Ill. 2d at 76. And Souk, the lead prosecutor, acknowledged that polygraph evidence is "useful for investigative purposes" and that, had he known about the Murray polygraph, he would have "asked some questions and looked at it more." Thus, Murray's status as a viable suspect was directly affected by the fact that his polygraph result was concealed from Beaman and the prosecutor.

¶ 99
(c) Misleading Information
During Grand Jury Proceedings

¶ 100    Next, Beaman contends that the testimony presented to the grand jury was misleading about the information known to the investigative team. During the grand jury proceedings, Freesmeyer was questioned as to whether he had been able to locate any other person who "had any conceivable motive to kill Jennifer Lockmiller." Freesmeyer answered by stating, "No, not necessarily." This statement did not acknowledge that Murray "may have also had a motive to commit the offense based on his status as a drug dealer and [based on Lockmiller's] drug debt." *Beaman I*, 229 Ill. 2d at 80. According to Beaman, Freesmeyer's grand jury testimony concealed the fact that there was at least one other viable suspect who could have been responsible for the murder.

¶ 101    Beaman also argues that the detectives misled the grand jury by falsely testifying that the investigators did not obtain any helpful information from Lockmiller's neighbors. According to Beaman, that testimony mischaracterized the information obtained from Singley, which would have excluded Beaman as a suspect. In Beaman's view, a rational juror could find that defendants misled the grand jury about the existence of other viable suspects who may have had a motive to kill Lockmiller.

¶ 102
(d) Knowingly Providing Misinformation
to Prosecutor

¶ 103    In addition, Beaman argues that Freesmeyer deliberately manipulated the driving time trials in order to fraudulently discredit his alibi. In June 1994, Freesmeyer performed driving time trials from the bank to the Beaman residence to ascertain whether Beaman could have made the telephone calls that were made at 10:37 and 10:39 a.m. The numerous time trials conducted by Freesmeyer, all of which were performed within the speed limit, included one indicating that Beaman could have driven home from the bank in time to make the calls. This was the only time trial that was omitted from Freesmeyer's report. According to Beaman, a reasonable juror could conclude that Freesmeyer intentionally omitted the only time trial that was exculpatory and consistent with his alibi.

¶ 104        Moreover, Freesmeyer conducted additional driving time trials in January 1995, which showed that Beaman could have arrived at Lockmiller's apartment just before noon if he had left from the bank at 10:11 a.m. and drove an average speed of 75 miles per hour. Those time trials also indicated that, if Beaman made the return trip at an average speed of 75 miles per hour, he could have arrived home by 2:15 p.m., the time at which Mrs. Beaman saw her son's car in the driveway when she returned from the store. Thus, by exceeding the speed limit, Freesmeyer was able to produce time trial evidence that was consistent with the 15-minute window of opportunity—between 12 and 12:15 p.m.—that was necessary to accommodate both Carol Beaman's uncontradicted evidence and Beaman's guilt. In Beaman's view, a juror could interpret Freesmeyer's manipulation of these time trials as further evidence of misconduct.

¶ 105        Defendants counter that all of the evidence set forth above indicates nothing more than negligent police work and that such inadvertent conduct cannot form the basis of a malicious prosecution claim. In reply, Beaman opposes this argument by asserting that defendants deliberately embarked on a bad-faith investigation that was structurally designed and developed to implicate him and that, when viewed through an impartial lens, the evidence showed that he was not a viable suspect.

¶ 106        Both conclusions are possible. When the reasonable inferences are drawn in favor of Beaman—as they must be on summary judgment—a rational juror could find that defendants played a significant role in the commencement and continuation of the murder prosecution. Because Beaman has presented sufficient evidence to create a genuine issue of material fact, the lower courts erred in holding, as a matter of law, that he could not establish the commence-and-continue element of his malicious prosecution claim. That determination must be resolved by a trier of fact.

¶ 107                        2. The Favorable Termination Element

¶ 108        Beaman contends the circuit court erred in holding, as a matter of law, that he could not establish the favorable termination element. Defendants respond by arguing that Beaman cannot carry his burden of proving that the prosecution terminated in his favor for reasons consistent with his innocence. Defendants maintain that prosecution was terminated with the *nolle prosequi* of the criminal

charge against Beaman after this court's 2008 remand and is not *per se* indicative of his innocence. Defendants further contend that, since they had no meaningful opportunity to oppose Beaman's petition for a certificate of innocence or to litigate the gubernatorial pardon, neither of these certificates has any effect in this case. We disagree.

¶ 109    In *Swick*, this court adopted the majority rule that a criminal proceeding has been terminated in favor of the accused when a prosecutor formally abandons the proceeding via a *nolle prosequi*, unless the abandonment is for reasons not indicative of the innocence of the accused. *Swick*, 169 Ill. 2d at 513 (citing *McKenney v. Jack Eckerd Co.*, 402 S.E.2d 887, 888 (S.C. 1991)); see also 54 C.J.S. *Malicious Prosecution* § 68 (2021) (recognizing that, in general, abandonment of an action or entry of a *nolle prosequi* for reasons that imply or are consistent with innocence, is sufficient to support a malicious prosecution claim). This court has stressed that it is the circumstances surrounding the entry of the *nolle prosequi* that must be examined and not the mere form or title of the disposition. *Cult Awareness Network v. Church of Scientology International*, 177 Ill. 2d 267, 279 (1997). To support a malicious prosecution claim, the circumstances surrounding the abandonment of the criminal proceedings must compel an inference that there existed a lack of reasonable grounds to pursue the criminal charge. *Swick*, 169 Ill. 2d at 513-14. Dismissal of a charge on other than purely technical grounds, such as lack of jurisdiction or defective pleading, may be said to form a basis for a malicious prosecution action. *Rich v. Baldwin*, 133 Ill. App. 3d 712, 716 (1985).

¶ 110    In reviewing Beaman's postconviction proceedings, this court concluded that "there is a reasonable probability that the result of the trial would have been different if [Beaman] had presented the evidence establishing [Murray] as an alternative suspect." *Beaman I*, 229 Ill. 2d at 81. As noted above, this court further held that "[w]e cannot have confidence in the verdict finding [Beaman] guilty of this crime given the tenuous nature of the circumstantial evidence against him." *Id.* Following our disposition, the State declined to retry Beaman and entered a *nolle prosequi* of the murder charge. Thus, the circumstances surrounding the abandonment of the criminal proceedings support an inference that there existed a lack of reasonable grounds to pursue the criminal prosecution. See Restatement (Second) of Torts § 659 (1977); 54 C.J.S. *Malicious Prosecution* § 68 (2021); *Rich*, 133 Ill. App. 3d at 715.

¶ 111 Thereafter, Beaman petitioned for a certificate of innocence, and the State withdrew its initial opposition to the certificate after receiving the results of DNA testing in 2012, which excluded Beaman as a possible contributor to the genetic profiles retrieved from evidence at the crime scene. In April 2013, the circuit court of McLean County, acknowledging that the State's Attorney's Office had withdrawn its intervention, issued a certificate of innocence pursuant to section 2-702 of the Code of Civil Procedure (735 ILCS 5/2-702 (West 2012)). The certificate issued by the court stated that Beaman is "innocent of the offenses charged in the indictment."

¶ 112 In addition, Beaman's gubernatorial pardon based on innocence indicates that the proceedings concluded in his favor. A general pardon merely forgives a defendant for having committed an offense, whereas an innocence pardon absolves a defendant of guilt. *People v. Chiappa*, 53 Ill. App. 3d 639, 641 (1977); 29 Ill. Law & Prac., *Pardon & Parole* § 3 (2013). The gubernatorial pardon granted in January 2015 states that Beaman "is hereby acquitted and discharged of and from all further imprisonment and restored to all the rights of citizenship which may have been forfeited by the conviction." The pardon also states the following in bold typeface: "Grant Pardon Based Upon Innocence As If No Conviction."

¶ 113 The evidence set forth above raises a genuine issue of material fact whether the criminal proceedings were terminated in a manner indicative of Beaman's innocence. *Cult Awareness*, 177 Ill. 2d at 279. Viewing the evidence in the light most favorable to Beaman, as we must on summary judgment, we find that it is possible for him to prove facts that establish his allegation that the prosecution was resolved in his favor. Accordingly, the entry of summary judgment for defendants was not appropriate.

¶ 114                      3. The Absence of Probable Cause Element

¶ 115 Beaman also challenges the lower courts' findings that he could not establish a lack of probable cause for his arrest and prosecution. Defendants respond that the appellate court correctly upheld the circuit court's grant of summary judgment based on the finding that probable cause existed for Beaman's arrest.

¶ 116    Lack of probable cause for instituting the original proceedings is an indispensable element of an action for malicious prosecution. *Freides v. Sani-Mode Manufacturing Co.*, 33 Ill. 2d 291, 295 (1965). Probable cause is defined as a state of facts that would lead a reasonably cautious person to believe, or to entertain an honest and strong suspicion, that the person arrested committed the offense charged. *Poris v. Lake Holiday Property Owners Ass'n*, 2013 IL 113907, ¶ 63; *People v. Love*, 199 Ill. 2d 269, 279 (2002); *Harpham v. Whitney*, 77 Ill. 32, 42 (1875). A mistake or error that is not grossly negligent will not affect the question of probable cause in an action for malicious prosecution when there is an honest belief by the complainant that the accused is probably guilty of the offense. *Harpham*, 77 Ill. 2d at 42; see also *Johnson v. Target Stores, Inc.*, 341 Ill. App. 3d 56, 72 (2003).

¶ 117    A *prima facie* showing of probable cause may be established by the return of an indictment by the grand jury, but issuance of an indictment is not conclusive evidence of probable cause. *Freides*, 33 Ill. 2d at 295. Such a showing may be rebutted by other evidence, such as proof that the indictment was obtained by false or fraudulent testimony before the grand jury, by failing to make a full or complete statement of facts, or by other improper or fraudulent means. *Id.* In the context of an action for malicious prosecution, the assessment of probable cause depends on the totality of the circumstances existing when defendants commenced the prosecution. *Gauger v. Hendle*, 2011 IL App (2d) 100316, ¶¶ 112, 115.

¶ 118    (a) Means, Motive, and Opportunity

¶ 119    Beaman argues that the detectives lacked probable cause to arrest and prosecute him because their investigation showed he could not have committed the murder. Defendants respond by arguing that they reasonably believed in May 1994 that Beaman had murdered Lockmiller because the evidence indicated he was the only person who had means, motive, and opportunity to commit the crime. In support, defendants rely on several factual assertions that they claim are undisputed and support a finding of probable cause.

¶ 120    We find, however, that several of defendants' asserted facts are not undisputed. In addition, many of those facts permit differing inferences that, when construed in Beaman's favor, support the lack of probable cause.

¶ 121    First, defendants assert that it is undisputed that Lockmiller was afraid of Beaman, who had an aberrant obsession with her and acted violently around her by breaking down her door and punching a hole in a wall of her apartment. Yet this court has previously held that, although Beaman had been violent toward objects, he had never been physically violent toward Lockmiller. *Beaman I*, 229 Ill. 2d at 78-79.

¶ 122    In addition, Lockmiller's alleged fear of Beaman is countered by evidence that on August 4, three weeks before her murder, Lockmiller spent time with Beaman and the two parted amicably after he drove her to class. Further, the telephone records establish that on August 22, three days before her murder, Lockmiller called Beaman 28 times, apparently seeking to resume their relationship.

¶ 123    Also, the evidence does not show that the murder was committed by Beaman in a "jealous rage" when he "discovered" that Lockmiller was secretly having sex with his roommate. Rather, the undisputed evidence shows that Beaman became aware of the relationship between Lockmiller and Swaine as early as mid-July, more than a month before the murder. Also, Beaman confronted Swaine and Lockmiller multiple times during July about their relationship, and he saw Swaine's things at Lockmiller's apartment on August 4. Furthermore, Swaine stated that Beaman had left town at the end of July to end his relationship with Lockmiller and that, when he returned in early August, Beaman seemed to be "in a better place."

¶ 124    Defendants also contend it is undisputed that the evidence shows Beaman's fingerprints were found on the "murder weapon" and that the crime scene indicated a "signature act" by Beaman. Neither contention is undisputed.

¶ 125    The contention that Beaman's prints were on the "murder weapon" is misleading. The record affirmatively establishes that no fingerprints were found on the cord of the clock radio, which was used to strangle Lockmiller. In addition, no fingerprints were found on the scissors that were lodged in Lockmiller's chest. Moreover, Beaman's fingerprints were not the only ones found on the clock radio, which revealed four of Swaine's fingerprints and another print from an individual who was never identified.

¶ 126    Defendants' assertion that the crime scene showed a "signature act" by Beaman is similarly misleading. That assertion refers to a prior incident involving

Lockmiller's bathroom wastebasket at a time when Beaman was trying to ascertain whether she was seeing other men. The evidence at the crime scene revealed that the bathroom wastebasket was untouched, but the kitchen garbage can was removed, and the kitchen garbage bag was found on the couch. None of the finger or palm prints found on the kitchen garbage can or bag matched Beaman's. Thus, the forensic evidence does not indisputably support a finding of probable cause.

¶ 127     Lastly, defendants argue that it is undisputed that the timeline, although narrow, showed it was physically possible for Beaman to have murdered Lockmiller and returned to Rockford within the applicable window. Defendants' assertion is not undisputed, and it disregards the evidentiary conflict as to who made the telephone calls from the Beaman residence to the church pastor on the morning of the murder. Although defendants asserted that Beaman's mother could have made the calls, there is no actual evidence supporting that assertion. In fact, Beaman's mother testified that she did not return home until 2:15 p.m., and the church pastor testified that he always communicated with Beaman and had never received a call from Beaman's mother.

¶ 128     Further, the medical examiner initially provided a timeline for Lockmiller's death of 48 hours, from 12 p.m. on August 25 through 12 p.m. on August 27. That timeline was later collapsed to a four-hour period from 12 to 4 p.m. on Wednesday, August 25, based on evidence that Lockmiller attended her 11 a.m. class that day but did not attend her 2 p.m. class and missed an appointment with the people who visited her apartment at 4:20 p.m. That four-hour time period was consistent with the evidence obtained from Singley, Lockmiller's neighbor. By the time of trial, the detectives further collapsed the timeline to a 15-minute window between 12 and 12:15 p.m. based on evidence from Beaman's mother.

¶ 129     Moreover, the timeline proposed by defendants required Beaman to drive 75 miles per hour round trip and spend just 15 minutes in Lockmiller's apartment. According to defendants, during that 15-minute window Beaman arrived at Lockmiller's apartment, flew into a jealous rage, strangled Lockmiller with the cord of the clock radio, stabbed her in the chest several times, adjusted her clothes so as to make it appear as though she had been sexually assaulted, rummaged through her kitchen garbage, left the garbage bag on the couch, and sped home to arrive by 2:10 p.m., just five minutes before his mother saw his car in the driveway.

Defendants' theory that the crime was committed in a jealous rage, which suggests a lack of planning, does not account for the lack of Beaman's fingerprints anywhere in the apartment except on the clock radio.

¶ 130    As for Beaman being the only person who had the means, motive, and opportunity, we do not agree that this factual assertion is undisputed. This court held in 2008 that Murray was a viable suspect. *Beaman I*, 229 Ill. 2d at 80. Murray had no alibi, and his telephone records prove that he was in Normal on the day of the homicide. Also, Lockmiller owed him money for drugs he had sold her, and he may have had a motive based on jealousy because he saw Swaine with Lockmiller at a time when he thought he might renew his relationship with her. *Id.* In addition, evidence of Murray's abuse of steroids since January 1993 and his prior violent outburst toward a former girlfriend support an inference that he had a tendency to act violently toward others. *Id.* at 76. Significantly, Freesmeyer signed the police reports regarding Murray's arrest on domestic violence charges in October 1994 and was aware that an order of protection had been filed against him. This intervening fact—occurring several months after Beaman's arrest and indictment—enhanced Murray's viability as a suspect, which tended to exonerate Beaman and diminished the probable cause for his prosecution. See *Johnson*, 341 Ill. App. 3d at 78.

¶ 131    Moreover, aside from Murray, there may have been other unidentified persons who had the means, motive, and opportunity but were not explored during the investigation. As Zayas explained, that universe of potential suspects included the transient campus population of students who frequented the area of the crime scene, which was located on a busy thoroughfare. Further, the murder weapon was in the apartment and available to anyone who gained entry—by whatever means.

¶ 132    The facts discussed above refute defendants' assertion that a finding of probable cause was supported by undisputed evidence that Beaman was the only person who had means, motive, and opportunity to commit the crime.

¶ 133                    (b) Beaman's Arrest Was a Rush to Judgment

¶ 134    Finally, defendants point out that Detective Daniels, who advocated continuing the investigation, agreed that there was probable cause for Beaman's arrest.

Admittedly, Daniels opined that there was probable cause to arrest Beaman. But Daniels further stated that he had been trained that, if a suspect cannot be excluded, that person must be included in the investigation.

¶ 135    Daniels believed that, at the time of Beaman's arrest, Murray was a strong viable suspect who still needed to be ruled out based on his contradictory statements, his proximity to Lockmiller's residence, his statement that he and Lockmiller were about to renew their relationship, his status as her drug supplier, his lack of cooperation when taking his polygraph test and his failure to show for the second one, the fact that he was on steroids, that he had been involved with assaulting a woman, and that he was being investigated by the Department of Criminal Investigations for drug trafficking. Daniels did not agree with Souk that Beaman was "our guy" and felt that the investigation was not complete. In Daniels's view, the decision to arrest Beaman was a "rush to judgment."

¶ 136                    (c) Alternative Ground

¶ 137    In arguing that probable cause existed, defendants also rely on the appellate court's alternative ground that no court has ever deemed the evidence against Beaman insufficient to sustain his conviction. We note that the appellate court cited no authority to support this alleged ground. In addition, the law set out above clarifies that the totality of the circumstances existing at the time of the prosecution is the relevant time frame to determine probable cause. Moreover, we do not believe a determination of probable cause may be based on the evidence presented at a trial that this court has held was tainted by a *Brady* violation. In this case, the probable cause determination necessarily includes consideration of the evidence withheld at trial—which demonstrated that Murray was a viable suspect and which tended to exonerate Beaman. See *Johnson*, 341 Ill. App. 3d at 78.

¶ 138    The record is beset with complex facts from which competing inferences can be drawn. In deciding whether summary judgment is proper, the record must be strictly construed against defendants and liberally in favor of Beaman. We find that Beaman has presented sufficient evidence to create a genuine issue of material fact as to whether there was an absence of probable cause to arrest and prosecute him for the murder. That determination must—and can only—be resolved by a trier of

fact, and the lower courts erred in finding otherwise.

¶ 139                                   4. The Malice Element

¶ 140        Lastly, Beaman argues that the circuit court erred in finding, as a matter of law, that he cannot establish defendants acted with malice. Defendants oppose this argument by asserting that the record does not show that they acted with anything but an honest belief that Beaman killed Lockmiller. According to defendants, the circuit court correctly found that the record did not show that they were motivated by any reason other than attempting to bring the responsible party to justice.

¶ 141        Malice, as an element of malicious prosecution, has been defined as the initiation of a prosecution for an improper motive. *Glenn v. Lawrence*, 280 Ill. 581, 586 (1917); *Rodgers*, 315 Ill. App. 3d at 349. An improper motive for a prosecution is any reason other than to bring the responsible party to justice. *Rodgers*, 315 Ill. App. 3d at 349; *Mack v. First Security Bank of Chicago*, 158 Ill. App. 3d 497, 501 (1987). The element of malice may be inferred from a lack of probable cause when the circumstances are inconsistent with good faith by the prosecutorial team and lack of probable cause has been clearly proved. *Reynolds v. Menard, Inc.*, 365 Ill. App. 3d 812, 822 (2006); *Williams v. City of Chicago*, 733 F.3d 749, 759-60 (7th Cir. 2013). As Illinois courts have observed,

> "[w]here two conflicting inferences may be drawn from the evidence—one of good-faith actions on the part of the defendant and the other of actions inconsistent with good faith or, in other words, malicious actions—the question whether the defendant acted with malice is for the trier of fact to determine." *Frye*, 166 Ill. App. 3d at 977-78 (citing *Mack*, 158 Ill. App. 3d 497).

"In order to create a question for the trier of fact," "circumstantial evidence which would support an inference of malice is sufficient." *Id.*

¶ 142        In addition, it is generally recognized that, because malice is incapable of positive, direct proof, it necessarily rests on inferences and deductions from the facts that are heard by the trier of fact. See 54 C.J.S. *Malicious Prosecution* § 56 (2021). Further, the decision to go forward carelessly or recklessly with previously commenced proceedings, after receiving notice of a problem, may be inconsistent

with good faith and show malice required to support a claim of malicious prosecution. See 54 C.J.S. *Malicious Prosecution* § 54 (2021).

¶ 143　　In 2008, this court held that Beaman's jury trial was tainted by a *Brady* violation. That determination necessarily required a finding that evidence was suppressed by the State either willfully or inadvertently. *Beaman I*, 229 Ill. 2d at 73-74. In reaching that conclusion, this court observed that the State did not dispute it knew of but did not disclose four distinct evidentiary matters relating to Murray's viability as a suspect: (1) failure to complete the polygraph examination, (2) charges of domestic battery and possession of marijuana with intent to deliver prior to Beaman's trial, (3) physical abuse of his girlfriend on numerous occasions, and (4) use of steroids, which caused him to act erratically. *Id.* at 74-75. In fact, the State admitted that the aforementioned evidence was " 'withheld.' " *Id.* at 75. The fact that four separate pieces of evidence, acquired by the detectives at different times during the investigation, were admittedly withheld from Beaman could support a finding of incompetence, mistake, or malice.

¶ 144　　In support of his claim that defendants acted with malice, Beaman relies on several evidentiary factors that he contends establish defendants' ill intent. Specifically, Beaman points to Freesmeyer's premature focus on him as the primary suspect without excluding all other viable suspects, his threat to seek the death penalty, his manipulation of time trials to coincide with a 15-minute window of opportunity during which Beaman allegedly could have committed the murder, and his unsubstantiated belief that Beaman's mother made the telephone calls to the church pastor on the morning of the murder. According to Beaman, this evidence supports an inference that Freesmeyer acted with the goal of winning a conviction and possible promotion without regard to whether the actual perpetrator was being prosecuted.

¶ 145　　In addition, Freesmeyer had reported in September 1993 that Beaman's mother was the only one who could verify his alibi, but she was not interviewed until after Beaman was arrested in May 1994. Also, although Freesmeyer admitted that the time trials were an important part of the investigation, he made no effort to perform them until late June 1994, more than a month after the arrest. Delaying the verification of Beaman's alibi after his arrest may have colored the inquiry by

narrowing its scope and allowing the detectives to construct the investigation to substantiate their predetermined belief in Beaman's guilt.

¶ 146　　Beaman further points to the fact that Freesmeyer believed the murder was a crime of passion and that the only person who had passionate feelings toward Lockmiller was Beaman. Yet, Freesmeyer reached this conclusion despite the contrary evidence that Gates relocated from Wisconsin so he could be closer to Lockmiller, Murray indicated that he and Lockmiller were going to renew their relationship, and Swaine began a sexual relationship with Lockmiller in June 1993 and moved into her apartment a few weeks before she was murdered. In Beaman's view, this evidence suggests that Freesmeyer remained fixated on him to the exclusion of other viable suspects and acted with an improper motive.

¶ 147　　Moreover, Freesmeyer signed the reports regarding Murray's arrest on domestic violence charges in October 1994 and was aware that an order of protection had been filed against him. Freesmeyer did not consider this information pertinent. These circumstances could indicate that Freesmeyer went forward carelessly or recklessly with the criminal proceedings despite having received notice of a problem, which is inconsistent with a good-faith investigation.

¶ 148　　Beaman further relies on the fact that even the appellate court acknowledged that Warner's failure to turn over Murray's polygraph report could have been intentional. 2019 IL App (4th) 160527, ¶ 110. According to Beaman, Warner's conduct may be viewed as intentional concealment of material information—which supports an inference that Warner acted with malice. Beaman also points out that Zayas admitted he did not believe the case was "ready" at the time of Beaman's arrest. Yet, Zayas participated in the May 16 discussion of probable cause and acquiesced in the decision to arrest Beaman before the case was fully developed. In Beaman's view, Zayas's conduct indicates that he also acted with malice.

¶ 149　　When the reasonable inferences are drawn in favor of Beaman, as they must be when reviewing a grant of summary judgment, a rational juror could find that defendants intentionally ignored, shaped, interpreted, or created evidence to support their conclusion that Beaman was guilty. Thus, Beaman has presented sufficient evidence to permit a reasonable inference that the detectives acted with the improper purpose to obtain a conviction regardless of the evidence. See *Frye*, 166 Ill. App. 3d at 977-78. We find that there are genuine issues of material fact

regarding defendants' intent and, therefore, defendants' right to summary judgment is not clear and free from doubt as a matter of law. Accordingly, Beaman is entitled to have a jury determine whether the detectives acted with malice. See *Adams*, 211 Ill. 2d at 43.

¶ 150                                    III. CONCLUSION

¶ 151        In sum, we hold that genuine issues of material fact exist as to whether Beaman can prove his claim for malicious prosecution. Consequently, we reverse the entry of summary judgment for defendants on that count. Because Beaman's remaining claims for intentional infliction of emotional distress, civil conspiracy, and for damages based on theories of *respondeat superior* and indemnification are dependent on the viability of his malicious prosecution claim, the entry of summary judgment on those counts is reversed as well. Accordingly, we reverse the judgments of the lower courts and remand the cause to the circuit court for further proceedings.

¶ 152        Reversed and remanded.

¶ 153        JUSTICE MICHAEL J. BURKE, dissenting:

¶ 154        The majority concludes that genuine issues of material fact concerning all five elements of Beaman's malicious prosecution action preclude summary judgment for defendants. I respectfully disagree on the ground that the existence of probable cause for instituting the original criminal proceeding is a complete defense to Beaman's claim. For that reason, I would affirm the summary judgment. As the absence of probable cause is an indispensable element of a malicious prosecution action, I need not comment on the remaining elements. I respectfully dissent.

¶ 155        As a threshold matter, I wish to clarify the operative time frame for ascertaining the existence of probable cause. The majority states that probable cause should be measured "when defendants commenced the prosecution" (*supra* ¶ 117) but also that "the probable cause determination necessarily includes consideration of the evidence withheld at trial" (*supra* ¶ 137), without regard to whether defendants

- 35 -

were aware of the withheld evidence when the prosecution commenced or were responsible for its nondisclosure.

¶ 156    In the context of a malicious prosecution action, the point at which probable cause should be assessed depends on a person's role in the commencement or continuance of the criminal prosecution. Malicious prosecution extends to all persons who played a "significant role" in causing the prosecution of the plaintiff, provided all the elements of the tort are present. *Beaman v. Freesmeyer*, 2019 IL 122654, ¶ 43. A person plays a "significant role" if his or her participation in the criminal case was so " 'active and positive' " to " 'amount to advice and co-operation' " or if that person (1) improperly exerted pressure on the prosecutor, (2) knowingly provided misinformation to the prosecutor, (3) concealed exculpatory evidence, or (4) otherwise engaged in wrongful or bad-faith conduct instrumental in the initiation of the prosecution. *Id.* ¶ 45 (quoting *Gilbert v. Emmons*, 42 Ill. 143, 147 (1866)).

¶ 157    To satisfy the absence-of-probable-cause element in his action against defendants, Beaman must show that defendants played a significant role in the commencement or continuance of the criminal prosecution despite knowledge of a state of facts that reasonably indicated probable cause was lacking. But the probable cause determination is ever evolving, and a person who plays a significant role in the commencement of a prosecution might not sustain that role throughout the proceedings.

¶ 158    Here, the May 1994 meeting where State's Attorney Reynard and Assistant State's Attorney Souk decided to charge Beaman is the point at which probable cause should be assessed. Assuming *arguendo* that defendants played a significant role in the commencement of the proceedings, they ceased playing a significant role when they brought the results of their investigation to the prosecutors, who took over after the meeting. To the extent defendants obtained new information about Murray after Beaman's arrest, Freesmeyer included the information in his October 1994 report, and the prosecutors acted on it by bringing charges against Murray. Specifically, Souk testified that he was aware of the new charges against Murray, yet he proceeded with the prosecution of Beaman. Even if Freesmeyer's report diminished the probable cause to believe Beaman committed the murder, Beaman's

arrest is the point at which the existence of probable cause should be determined under these facts.

¶ 159     Defendants assert they reasonably believed in May 1994 that Beaman murdered Lockmiller, based on evidence that he was the only person known to have the means, the motive, and the opportunity to commit the offense. The issue arises in the context of summary judgment, which requires us to construe the evidence in the light most favorable to Beaman, the nonmoving party. Thus, the majority concludes that "several of defendants' asserted facts are not undisputed" and that "many of those facts permit differing inferences that, when construed in Beaman's favor, support the lack of probable cause." *Supra* ¶ 120. The majority purports to construe the evidence in the light most favorable to Beaman but in fact has distorted the summary judgment standard by disregarding the overwhelming evidence supporting probable cause.

¶ 160     When assessing whether the state of facts known to the police at the time of the arrest supports probable cause, a court must examine the totality of the circumstances. The majority's decision is not based on the totality of the circumstances, because it does not give due weight to the overwhelming evidence of probable cause. Even construing the evidence in the light most favorable to Beaman, I conclude the totality of the circumstances known to defendants at the time of the arrest would lead a reasonably cautious person to believe or to entertain an honest and strong suspicion that Beaman had the means, the motive, and the opportunity to murder Lockmiller. *Poris v. Lake Holiday Property Owners Ass'n*, 2013 IL 113907, ¶ 63; *People v. Love*, 199 Ill. 2d 269, 279 (2002).

¶ 161     There is no dispute that Lockmiller's apartment showed no signs of forced entry, and her bookbags and purse were undisturbed, which would suggest to a reasonably cautious person that the murder was not the result of a burglary and that Lockmiller knew her attacker.

¶ 162     The police admittedly focused on Beaman from the start, but their tunnel vision was not a rush to judgment as the majority claims. The police investigated other individuals Lockmiller knew, including her current boyfriend, Swaine, and former boyfriends, Gates and Murray. Swaine and Gates had alibis, leaving Beaman and Murray as possible suspects.

¶ 163     The offender strangled Lockmiller with the cord attached to her clock radio and left the cord knotted around her neck. Two fingerprints recovered from the clock radio base were from Beaman. But because the cord, not the base, was used to kill Lockmiller, the majority rejects the notion that Beaman's fingerprints were found on the murder weapon or that the discovery of his fingerprints implicated him. The majority, purporting to construe the evidence in the light most favorable to Beaman, mischaracterizes the cord and the base as separate objects, as if the part of the clock radio with Beaman's fingerprints was not involved in the crime. Under the circumstances, a reasonably cautious person would strongly suspect that Beaman left his fingerprints on the base when he picked up the clock radio to strangle Lockmiller with the cord.

¶ 164     Among the remaining fingerprints on the clock radio base, four came from Swaine, who had an alibi, and one was unidentified. The possibility that the unidentified fingerprint came from the offender is relevant when assessing the totality of the circumstances. But as the investigation unfolded, Beaman's history of erratic and violent behavior toward Lockmiller provided compelling evidence of his motive and diminished the likelihood that someone else murdered Lockmiller.

¶ 165     The police learned that Beaman and Lockmiller began a relationship that turned tumultuous and violent. They broke up and rekindled the relationship 17 to 18 times over 12 months. The final breakup occurred about one month before the murder. The couple had a history of loud arguments, including one that ended with Beaman drinking nail polish remover and Lockmiller driving him to a hospital. According to the "love letters" found in Lockmiller's apartment, Beaman wanted their relationship to be monogamous, but he correctly suspected she was seeing other men. Beaman's letters referred to tragic Shakespearean characters, and one letter included an unsettling assurance: "Don't worry, I won't kill anybody."

¶ 166     In mid-July 1993, about a month before her death, Lockmiller started a relationship with Swaine, Beaman's friend and roommate. Swaine and Lockmiller tried to hide their relationship from Beaman. Swaine told the police that he considered Beaman his friend but reported that Beaman had made two holes in the walls of Lockmiller's apartment. Swaine also reported he was aware of an incident in which Beaman broke into Lockmiller's apartment and found her "fooling around" with Murray. Beaman broke in a second time, within two months of the

murder, when Swaine was there. Swaine ran and hid in the bedroom closet, and Beaman screamed at Lockmiller. Swaine heard Beaman scream, "I know you are in there," and then Beaman broke through the closet door. On a different date, Beaman searched Lockmiller's trash for Swaine's used condoms. Furthermore, Lockmiller's downstairs neighbors reported overhearing fights, about six months before the murder, between Lockmiller and a man who drove a silver Ford Escort—like the one driven by Beaman.

¶ 167        Lockmiller's body was discovered by her friend, Morgan Keefe, who immediately told the police that she knew "who did it," referring to Beaman. Keefe reported that Lockmiller had told her repeatedly that she was afraid of Beaman, and Keefe described Beaman as "possessive." Lockmiller told Keefe that Beaman had broken down her door and threatened suicide if she ended their relationship.

¶ 168        The majority minimizes Keefe's testimony that Lockmiller feared Beaman and the undisputed evidence that he kicked in Lockmiller's door, pointing out that, "although Beaman had been violent toward objects, he had never been physically violent toward Lockmiller." *Supra* ¶ 121. Distinguishing violence against the victim's property from violence against the victim herself is not construing the evidence in the light most favorable to Beaman; it is completely disregarding Beaman's pattern of violent, jealous outbursts in reaction to Lockmiller's alleged infidelity. Moreover, Beaman's repeated outbursts occurred where Lockmiller was ultimately murdered. By contrast, Beaman does not claim defendants suspected that anyone else acted violently toward Lockmiller *or* her property before her murder.

¶ 169        Beaman demanded monogamy, but Lockmiller began a romantic relationship with Swaine, Beaman's roommate, a short time before the murder. Consistent with the theory that jealousy drove Beaman to murder Lockmiller, the police discovered a plastic garbage bag on the couch in the living room, which was reminiscent of the time Beaman accused Lockmiller of infidelity and searched the trash for used condoms.

¶ 170        Beaman's relationship with Lockmiller supposedly ended in late July 1993, just a month before the murder. But three days before she was killed, Lockmiller called the Beaman residence in Rockford 28 times. Each call lasted only a few seconds and appeared to have been unanswered. The majority concludes this unusual behavior reflects the instability of Lockmiller, not Beaman, and therefore the

- 39 -

episode does not support probable cause. But a reasonably cautious person aware of the couple's history could suspect that Lockmiller's unusual pattern of calling Beaman three days before the murder would provoke an emotional and potentially violent response.

¶ 171    Furthermore, the time trials indicated Beaman had an opportunity, albeit slim, to murder Lockmiller and return to Rockford. 2019 IL App (4th) 160527, ¶ 78. At the time of the murder, Beaman was residing with his parents in Rockford, which was about a two-hour drive from Lockmiller's apartment in Normal. The State's theory was that, on the day of the murder, Beaman visited a Rockford bank at 10:11 a.m., drove to Normal, killed Lockmiller at noon, and returned to Rockford, where his mother saw him in his room at 2:15 p.m. Freesmeyer performed a time trial to confirm that Beaman could have made the trip in the time allotted by driving over the speed limit the entire way.

¶ 172    I agree with the appellate court that Beaman could never show the absence of probable cause. *Id.* ¶ 82. Defendants made a *prima facie* showing of probable cause based on the return of the indictment by the grand jury. *Freides v. Sani-Mode Manufacturing Co.*, 33 Ill. 2d 291, 296 (1965). Moreover, the appellate court reasoned that no court, in multiple reviews of the murder conviction, has ever deemed the evidence insufficient to convict. 2019 IL App (4th) 160527, ¶ 82. The court recounted that (1) the trial court denied Beaman's motion for a directed verdict, (2) the jury found him guilty beyond a reasonable doubt, (3) the appellate court rejected his challenge to the sufficiency of the evidence and affirmed the conviction on direct appeal, and (4) this court held there was no double-jeopardy impediment to a new trial. *Id.* ¶¶ 82-83; *People v. Beaman*, 229 Ill. 2d 56, 82 (2008) (*Beaman I*). The court cited these proceedings to illustrate the overlap in the evidence presented to the grand jury and at trial.

¶ 173    Of course, the State did not dispute it knew of but did not disclose at trial four distinct evidentiary matters relating to Murray's viability as a suspect: (1) the failure to complete the polygraph examination, (2) the domestic battery and drug charges brought prior to Beaman's trial, (3) the physical abuse of his girlfriend, and (4) the steroid use. The withheld evidence constituted a due process violation that compelled the reversal of Beaman's conviction. *Beaman I*, 229 Ill. 2d at 81. However, Beaman failed to argue that the evidence, including the withheld

evidence, was insufficient to remand the cause for further proceedings. Accordingly, we held that there was no double jeopardy impediment to a new trial. *Id*. at 82.

¶ 174    The majority now concludes the *Brady* violation renders the prior finding of guilt irrelevant to the probable cause determination, but the evidence known to defendants when Beaman was arrested was not the same as the evidence known to the prosecutors at trial. Admittedly, the polygraph report concerning Murray was created before Beaman's arrest but never reached the state's attorney's office. However, the criminal charges brought against Murray and his alleged abuse of Mackoway were known to those wielding prosecutorial authority over Beaman's case. Defendants, therefore, did not play a significant role in the nondisclosure of the new evidence concerning Murray. Once the prosecutors decided to charge Beaman, defendants were not responsible for the continuance of the criminal proceedings. And at the time of Beaman's arrest, the totality of the circumstances known to defendants overwhelmingly supported probable cause.

¶ 175    Beaman now argues that the inculpatory evidence should be disregarded in favor of exculpatory evidence, because the depositions, pleadings, affidavits, and admissions should be viewed in the light most favorable to him, the nonmovant. Specifically, Beaman argues (1) there was no physical evidence or eyewitness testimony connecting Beaman to the scene on the date of the murder, (2) Beaman maintained his innocence throughout an intense investigation, (3) "any number of men (known and unknown)" could have committed the crime, (4) Singley's account suggested that the murder occurred after 2 p.m., which made it impossible for Beaman to commit the crime, (5) in the late morning on the day of the murder, Beaman was about 130 miles away at a bank in Rockford, (6) the crime scene indicated that the offender was a stranger and much larger and more powerful than Beaman, and (7) the evidence against Murray was much stronger than the evidence against Beaman.

¶ 176    These allegations, taken as true, are part of the totality of the circumstances known to the police at the time of the arrest. However, for the preceding reasons, I conclude the evidence cited by Beaman does not negate the overwhelming evidence supporting probable cause at the time of his arrest.

¶ 177    Murray was a potential suspect, but the evidence implicating him in the offense was not nearly as strong as the evidence implicating Beaman. Murray was a drug dealer to whom Lockmiller allegedly owed $20 for the purchase of marijuana. Murray lived about 1½ miles from Lockmiller's apartment and had a sporadic sexual relationship with her. Murray gave inconsistent statements to the police, failed to complete the polygraph examination, and admitted that he previously had a physical altercation with a former girlfriend. But when Beaman was arrested, the police were not aware of any incident in which Murray had acted violently toward Lockmiller.

¶ 178    The totality of the circumstances known to the police indicated Murray was a potential suspect but that Beaman was much more likely to be the offender. First, Beaman's fingerprints were on the clock radio, which showed he had the means to commit the offense. Second, Beaman exhibited an undisputed pattern of violence toward Lockmiller in reaction to her alleged infidelity, which showed motive. Third, the time trials showed he had a narrow opportunity to commit the murder. Although the totality of the circumstances known to defendants at the time of the arrest must be viewed in the light most favorable to Beaman, I conclude no question of fact on the absence-of-probable-cause element remains. The existence of probable cause need not be decided by a trier of fact because divergent inferences may not be reasonably drawn from the undisputed material facts. See *Seymour v. Collins*, 2015 IL 118432, ¶ 42.

¶ 179    JUSTICE GARMAN joins in this dissent.


¶ 180    JUSTICE THEIS took no part in the consideration or decision of this case.