FIFTH DIVISION
November 9, 2006

No. 1-05-2684

| | | |
|---|---|---|
| SANG KEN KIM, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellant, | ) | Circuit Court of |
| | ) | Cook County |
| v. | ) | |
| | ) | |
| THE CITY OF CHICAGO, a Municipal Corporation; | ) | Honorable |
| NEAL JACK; and ROBERT RUTHERFORD, | ) | Michael J. Hogan, |
| | ) | Judge Presiding. |
| Defendants-Appellees. | ) | |

JUSTICE O'MARA FROSSARD delivered the opinion of the court:

Plaintiff, Sang Ken Kim, spent 3½ years in Cook County jail awaiting trial for first degree murder and rape. Prior to trial, the State dropped the charges against plaintiff and he was released. Thereafter, plaintiff filed suit against the City of Chicago, Chicago police detective Neal Jack, and Chicago police detective Robert Rutherford, alleging that he was coerced into giving a false confession, deprived of access to counsel, and subjected to malicious prosecution. All counts were resolved against plaintiff prior to trial. On appeal, plaintiff contends that the trial court erred in granting defendants' motion for summary judgment on the allegations of malicious prosecution because a genuine issue of material fact exists regarding whether the detectives had probable cause to arrest him and charge him with murder.

BACKGROUND

On April 6, 1997, 17-year-old E.X., who was 21 to 22 weeks pregnant, went to the

emergency room at Ravenswood Hospital, complaining of leaking fluid from her vagina. At Ravenswood Hospital, E.X. was seen by Dr. Anthony Caruso, who arranged to have her transferred to the University of Illinois at Chicago Medical Center (UIC).

UIC records show that E.X. was admitted on April 6, 1997, with prematurely ruptured membranes. On the afternoon of April 9, 1997, after extensive discussion with UIC doctors, including Dr. Elaine Chang, who was her principal treating physician, E.X. decided to have labor induced. E.X. was given medication to induce labor at 1:45 p.m. and 7:45 p.m.

Around 8:40 p.m. on April 9, 1997, E.X. reported to medical personnel that plaintiff, who was her boyfriend and the baby's father, had kicked her in the abdomen three times, pushed her, and made her fall, and that afterwards, she began "having watery discharge." Officers from the Chicago police department came to UIC and took a statement from E.X. E.X. told the officers that plaintiff pushed her to the floor, causing her to fall and strike her stomach on a piece of exercise equipment. E.X. said that while she was on the floor, plaintiff kicked her in the stomach "numerous times" and kicked her in the vagina. E.X. also told the officers that she began discharging fluid from her vagina two to three hours later.

E.X. gave birth to a baby boy at 12:14 a.m. on April 10, 1997. He died at 3 a.m.

Chicago police detectives Neal Jack and Robert Rutherford were assigned to investigate E.X.'s complaint against plaintiff. On April 10, 1997, the detectives met with E.X. at UIC. E.X. told the detectives that around 11:30 a.m. on April 4, 1997, she and plaintiff argued at plaintiff's house. E.X. related that during the argument, which was about E.X.'s pregnancy, plaintiff pushed her to the floor and kicked her in the stomach. Twice

2

when E.X. tried to rise, plaintiff pushed or threw her to the floor. When E.X. eventually got up, she went into the bathroom and noticed her underwear was damp. She believed the dampness was amniotic fluid. E.X. further related that around 3 p.m. that day, when she was back home, she noticed that her underwear and pants were again wet with amniotic fluid. She noticed the wetness once more later that afternoon or evening. E.X. told the detectives that she continued to discharge fluid for the next two days. She told the detectives that around 10 a.m. on April 6, 1997, Ann McCormack took her to the emergency room at Ravenswood Hospital. E.X. told the detectives that she was transferred to UIC, where she was treated by Dr. Elaine Chang. Finally, E.X. said that she had labor induced on April 9, 1997, and that a short time after the baby was born, he died.

After interviewing E.X., the detectives spoke with Dr. Chang. Dr. Chang told them that E.X.'s water bag was ruptured when she arrived at UIC. According to Dr. Chang, after she told E.X. that her water bag had been ruptured and explained her options to her, E.X. chose to have labor induced. Dr. Chang told the detectives that the baby was born on April 9, 1997, and died a short time later. According to Dr. Chang, after the amniotic sac was ruptured, it was unlikely that the baby could survive for a long period of time. Dr. Chang also told the detectives that it could not be confirmed that abdominal trauma caused the rupture of membranes.

The detectives then contacted Ann McCormack, who told them that E.X. called her around 10 a.m. on Saturday, April 5, 1997. McCormack drove to E.X.'s residence and picked her up. E.X. stayed at McCormack's house until Sunday morning. On Saturday evening, E.X. reported to McCormack that she was discharging some type of fluid from her

vaginal area. McCormack told the detectives that on Sunday morning when E.X. awoke, she was discharging a large amount of fluid. At that time, E.X. told McCormack that the discharge began on Friday evening and occurred several times throughout the day on Saturday.

McCormack told the detectives that she took E.X. to Ravenswood Hospital. Once there, she asked E.X. whether she had fallen before the discharge started. In response to the question, E.X. told McCormack that on Friday she and plaintiff had a fight during which they pushed and shoved each other. E.X. told McCormack that plaintiff picked her up and threw her to the floor a couple of times. When McCormack asked if plaintiff had punched her in the stomach, E.X. said no.

At some point during their investigation on April 10, 1997, the detectives learned that the hospital intended to cremate the baby. The detectives contacted the medical examiner's office, which subsequently ordered and received the baby's body for autopsy.

Around 6 p.m. on April 10, 1997, the detectives called plaintiff and asked him to come to the police station. According to the detectives' report, plaintiff told them that on April 4, 1997, he and E.X. were holding hands and arguing. Plaintiff said he pushed E.X.'s hand away and she fell onto the floor "with her buttocks hitting the floor and her back striking the weight bench." Plaintiff related that he then worked on his car with a friend, whose name the detectives recorded as "Hong Sook." After the interview, plaintiff left the police station.

On April 12, 1997, Dr. Nancy Jones conducted an autopsy on the baby. Dr. Jones indicated in her report that the baby "died as a result of prematurity due to premature

rupture of membranes due to maternal blunt abdominal trauma." Dr. Jones listed the manner of death as homicide.

On April 14, 1997, at 12:30 p.m., plaintiff was arrested by two officers not involved in the instant case. Around 2 p.m. that day, Detective Jack and Detective Rutherford interviewed plaintiff. According to the detectives' report, plaintiff related that during his argument with E.X. on April 4, 1997, he pushed E.X. to the floor, went to kick her in the leg but missed, and kicked her in the stomach. According to the detectives, plaintiff said that when E.X. got up, he grabbed her and pulled her back, and that he also kicked her in the thigh.

Between 5 p.m. and 7:30 p.m. on April 14, 1997, E.X. met with an assistant State's Attorney at the police station. After speaking with E.X. and the detectives, the assistant State's Attorney interviewed plaintiff around 9 p.m. Detective Jack was present for parts of the interview. According to the assistant State's Attorney's notes, plaintiff told her he pushed E.X., she fell to the ground, and then he kicked her in the stomach.

Around 10 p.m. on April 14, 1997, the assistant State's Attorney took a written statement from E.X. wherein she repeated her assertion that plaintiff kicked her in the stomach. E.X. further alleged that after kicking her in the stomach, plaintiff forced her to have sex with him. According to the detectives' report, when they asked plaintiff about E.X.'s claim, he initially denied it, but then admitted that he had sex with E.X. but "it was consensual." The report also indicated that plaintiff "admitted that at first she resisted him but after a while she relented."

On the morning of April 15, 1997, the detectives spoke with Dr. Jones, the medical

examiner who conducted the autopsy of the baby. Dr. Jones told the detectives that based on the autopsy and a review of the available medical records from Ravenswood Hospital and UIC, she determined the cause of death was prematurity due to premature rupture of membranes due to maternal blunt abdominal trauma, and that the manner of death was homicide.

At 5:30 p.m. on April 15, 1997, the assistant State's Attorney interviewed plaintiff a second time. Detective Jack was present for the interview. Some time between 9:45 p.m. and 10:15 p.m., plaintiff signed a written statement prepared by the assistant State's Attorney. At 12:15 a.m. on April 16, 1997, the assistant State's Attorney approved charges of first degree murder and criminal sexual assault against plaintiff.

In May 1997, a Cook County grand jury indicted plaintiff for first degree murder, simple and aggravated criminal sexual assault, and aggravated battery. Subsequently, plaintiff filed a motion to suppress his written statement, which was denied. In 2000, the assigned trial prosecutor met with E.X., who said that plaintiff had not kicked her in the stomach and that her original story was "something that she and her dad cooked up." Due to E.X.'s partial recantation, the prosecutor decided to dismiss the case against plaintiff.

On October 19, 2001, plaintiff filed suit against E.X., her father, the City of Chicago, the City of Chicago police department, Detective Jack, and Detective Rutherford. Five days later, plaintiff filed a first amended complaint, adding Dr. Jones and the medical examiner's office as defendants. On September 27, 2002, plaintiff filed a 12-count second amended complaint. In the caption of the second amended complaint, plaintiff listed all the above parties as defendants except for the Chicago police department. All 12 counts of the

second amended complaint were resolved against plaintiff, either by dismissal on the defendants' motions, voluntary dismissal, or summary judgment. As relevant to this appeal, the trial court granted summary judgment against plaintiff on count I, which was titled "Malicious Prosecution Defendants Detective Jack and Detective Rutherford," and count III, which was titled "Malicious Prosecution Defendant – City of Chicago and City of Chicago Police Department."

ANALYSIS

On appeal, plaintiff challenges the trial court's grant of summary judgment against him on counts I and III, which were his allegations of malicious prosecution against the City of Chicago, the City of Chicago police department, Detective Jack, and Detective Rutherford. Plaintiff's brief does not address the other counts of the second amended complaint.

Summary judgment is proper when the pleadings, depositions, and admissions on file, along with any affidavits, show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2004). In determining whether a genuine issue of material fact exists, a court must construe the pleadings, depositions, admissions and affidavits strictly against the movant and liberally in favor of the opponent. *Watkins v. Schmitt*, 172 Ill. 2d 193, 203 (1996). The propriety of an order granting summary judgment is a question of law which we review *de novo*. *Fabiano v. City of Palos Hills*, 336 Ill. App. 3d 635, 640-41 (2002). We may affirm the granting of summary judgment on any basis in the record, regardless of whether the trial court's reasoning was correct. *Fabiano*, 336 Ill. App. 3d at 641.

When a defendant moves for summary judgment, he may meet his initial burden of production either by affirmatively showing that some element of the cause of action must be resolved in his favor or by demonstrating that the plaintiff cannot produce evidence necessary to support the cause of action. *Fabiano*, 336 Ill. App. 3d at 641. In either case, the defendant must produce evidence that would clearly entitle him to judgment as a matter of law. *Fabiano*, 336 Ill. App. 3d at 641. Once the defendant satisfies his initial burden of production, the burden shifts to the plaintiff to present some factual basis that would arguably entitle the plaintiff to a favorable judgement. *Fabiano*, 336 Ill. App. 3d at 641.

To succeed on a claim of malicious prosecution, a plaintiff must establish five elements: (1) the commencement or continuation of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) malice; and (5) damages. *Fabiano*, 336 Ill. App. 3d at 641, citing *Swick v. Liautaud*, 169 Ill. 2d 504, 512 (1996). The failure to establish any one of these elements precludes recovery for malicious prosecution. *Fabiano*, 336 Ill. App. 3d at 641.

Plaintiff contends that the trial court erred in entering summary judgment for defendants on his counts of malicious prosecution. He argues that the trial court erred in finding that no genuine issue of material fact existed as to whether the defendant detectives had probable cause to arrest him and charge him with murder. Plaintiff asserts that the trial court's finding was in error due to the existence of the following genuine issues of material fact: (1) whether it was unreasonable for the detectives to rely upon E.X.'s allegations where her statements were inconsistent and uncorroborated; (2) whether plaintiff's signed

8

statement was illegally obtained; and (3) whether it was unreasonable for the detectives to rely upon the medical examiner's findings where they were based upon unsubstantiated information. Plaintiff additionally argues that the fact the grand jury indicted him does not require a finding that probable cause existed to arrest him and charge him with murder.

In the context of a malicious prosecution case, probable cause is defined as "a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged." *Fabiano*, 336 Ill. App. 3d at 642. It is the state of mind of the person commencing the prosecution that is at issue – not the actual facts of the case or the guilt or innocence of the accused. *Johnson v. Target Stores, Inc.*, 341 Ill. App. 3d 56, 72 (2003). When there is an honest belief by the complainant that the accused is probably guilty of the offense, a mistake or error that is not grossly negligent will not affect the question of probable cause. *Johnson*, 341 Ill. App. 3d at 72. A reasonable ground for belief of an accused's guilt may be on information from other persons as well as on personal knowledge. *Johnson*, 341 Ill. App. 3d at 72. The complainant is not required to verify the correctness of each item of information obtained; it is sufficient to act with reasonable prudence and caution. *Johnson*, 341 Ill. App. 3d at 72. In addition, "Where the victim of the crime supplies the police with the information forming probable cause, there is a presumption that this information is inherently reliable." *People v. Turner*, 240 Ill. App. 3d 340, 357-58 (1992).

After reviewing the record, we conclude that the trial court did not err in finding no genuine issue of material fact existed as to whether the defendant detectives had probable cause to arrest plaintiff and charge him with murder. The record reflects that probable

9

cause existed in this case. On April 10, 1997, Detective Jack and Detective Rutherford met with E.X. at the UIC Medical Center. At that time, E.X. told the detectives that around 11:30 a.m. on April 4, 1997, she and plaintiff argued at plaintiff's house. E.X. related that during the argument, which was about E.X.'s pregnancy, plaintiff pushed her to the floor and kicked her in the stomach. Twice when E.X. tried to rise, plaintiff pushed or threw her to the floor. When E.X. eventually got up, she went into the bathroom and noticed her underwear was damp. She believed the dampness was amniotic fluid. E.X. further related that around 3 p.m. that day, when she was back home, she noticed that her underwear and pants were again wet with amniotic fluid. She noticed the wetness once more later that afternoon or evening. E.X. told the detectives that she continued to discharge fluid for the next two days. She told the detectives that around 10 a.m. on April 6, 1997, Ann McCormack took her to the emergency room at Ravenswood Hospital. After being transferred to the UIC Medical Center, where she was treated by Dr. Elaine Chang, E.X. had labor induced on April 9, 1997. E.X. told the detectives that a short time after the baby was born, he died.

As noted above, "Where the victim of the crime supplies the police with the information forming probable cause, there is a presumption that this information is inherently reliable." *Turner*, 240 Ill. App. 3d 357-58. In this case, the detectives received information from the victim of a crime. Yet, instead of only relying on the presumption that E.X.'s information was reliable – which they could have done – they set about gathering more information to corroborate E.X. and establish probable cause. After interviewing E.X., the detectives spoke with Dr. Chang. According to Dr. Chang, after she told E.X. that her

water bag had been ruptured and explained her options to her, E.X. chose to have labor induced. Dr. Chang told the detectives that the baby was born on April 9, 1997, and died a short time later. According to Dr. Chang, after the amniotic sac was ruptured, it was unlikely that the baby could survive for a long period of time. Dr. Chang also told the detectives that it could not be confirmed that abdominal trauma caused the rupture of membranes.

The detectives then contacted Ann McCormack, who told them that E.X. called her around 10 a.m. on Saturday, April 5, 1997. McCormack drove to E.X.'s residence and picked her up. E.X. stayed at McCormack's house until Sunday morning. On Saturday evening, E.X. reported to McCormack that she was discharging some type of fluid from her vaginal area. McCormack told the detectives that on Sunday morning when E.X. awoke, she was discharging a large amount of fluid. At that time, E.X. told McCormack that the discharge began on Friday evening and occurred several times throughout the day on Saturday.

McCormack told the detectives that she took E.X. to Ravenswood Hospital. Once there, she asked E.X. whether she had fallen before the discharge started. In response to the question, E.X. told McCormack that on Friday she and plaintiff had a fight during which they pushed and shoved each other. E.X. told McCormack that plaintiff picked her up and threw her to the floor a couple of times. When McCormack asked if plaintiff had punched her in the stomach, E.X. said no.

At some point during their investigation on April 10, 1997, the detectives learned that the hospital intended to cremate the baby. The detectives contacted the medical

examiner's office, which subsequently ordered and received the baby's body for autopsy. On April 15, 1997, the detectives spoke with Dr. Jones, the medical examiner who performed the autopsy on the baby. Dr. Jones told the detectives that based on the autopsy and a review of the available medical records from Ravenswood Hospital and UIC, she determined the cause of death was prematurity due to premature rupture of membranes due to maternal blunt abdominal trauma, and that the manner of death was homicide.

We conclude that, based on the above information, which was known to the detectives at the time of arrest, the detectives held an objectively reasonable belief that plaintiff had committed murder. See *Aboufariss v. City of DeKalb*, 305 Ill. App. 3d 1054, 1062 (1999) (in malicious prosecution case, summary judgment was proper on question of probable cause where defendants held an objectively reasonable belief that plaintiff had committed a crime). As explained earlier, in the context of a malicious prosecution case, probable cause is defined as "a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged." *Fabiano*, 336 Ill. App. 3d at 642. We find that there is no genuine issue of material fact regarding the existence of probable cause in this case, and therefore, also find that the trial court acted properly in granting defendants' motion for summary judgment on the allegations of malicious prosecution.

Plaintiff asserts that defendants could not have reasonably relied upon E.X.'s statements because they were inconsistent and uncorroborated. In support of his argument that E.X.'s statements were inconsistent, plaintiff notes that (1) the UIC medical

12

records reflect E.X.'s report that plaintiff kicked her in the stomach "three times," while the April 10, 1997, police report reflects E.X. reported being kicked "numerous times," and E.X.'s signed statement indicates she was kicked one time; and (2) the Ravenswood Hospital records indicate E.X. reported that she started leaking fluid around 5 p.m. on April 4, 1997, and McCormick told the detectives that E.X. related the same time frame to her, but when E.X. spoke with the detectives and the assistant state's attorney, she reported that on April 4, she began leaking fluid right after the alleged assault and continued to do so throughout the day.

A claim of "three" kicks is consistent with a claim of "numerous" kicks. Also, contrary to plaintiff's assertion, E.X. did not report "one" kick in her written statement. Instead, E.X. reported simply that plaintiff kicked her in the stomach. She did not specify the number of kicks. Further, E.X. was consistent in reporting that she began leaking fluid on April 4, 1997. While she identified different hours for the commencement of the leaking, we cannot agree with plaintiff that this inconsistency was serious enough to deprive defendants of "an honest and sound suspicion that the accused committed the offense charged." *Fabiano*, 336 Ill. App. 3d at 642.

In support of his argument that E.X.'s allegations were uncorroborated, plaintiff notes that (1) records from Ravenswood Hospital and UIC Medical Center indicate that upon examination, E.X.'s abdomen was soft and nontender, without evidence of bruising; (2) Dr. Chang testified at her deposition that "there's no evidence, physical evidence, in the records that I can find that indicates maternal trauma" and that she told the detectives it could not "be confirmed that abdominal trauma caused" the rupture of membranes; (3) Dr.

Anthony Caruso testified that he was never contacted by anyone at the Chicago police department and that he did not see any evidence of trauma when he examined E.X. at Ravenswood Hospital; and (4) Hong Lim, a friend of plaintiff who was present when plaintiff worked on his car on April 4, 1997, testified that he was not contacted by the Chicago police department and that when he interacted with E.X. on the day in question, she did not appear to be angry, upset, or in distress.

We are unconvinced by plaintiff's arguments regarding corroboration. The existence of probable cause is measured based on the facts known to the officers at the time of the arrest. *Aboufariss*, 305 Ill. App. 3d at 1060, 1062-63. Here, in the course of their investigation, the detectives interviewed Dr. Chang, who had treated E.X. at UIC. Dr. Chang related to the detectives that she could not confirm that trauma was the cause of E.X.'s preterm delivery. As noted by defendants in their brief, this means that Dr. Chang also did not rule out abdominal trauma as the cause of E.X.'s preterm delivery. Thus, the medical facts known to the arresting officers did not contradict their reasonable belief that plaintiff had committed a crime.

Plaintiff accurately notes that defendants did not contact Dr. Caruso and Hong Lim in the course of their investigation. However, plaintiff has cited no requirement that police must interview all potentially relevant witnesses before determining probable cause exists, and our research has revealed no holdings to that effect. When making a determination regarding the existence of probable cause, courts must be guided by common sense and practical considerations. *People v. Harris*, 352 Ill. App. 3d 63, 66-67 (2004). Just as the police are not required to verify the correctness of each item of information they obtain

14

(*Johnson*, 341 Ill. App. 3d at 72, quoting *Turner v. City of Chicago*, 91 Ill. App. 3d 931, 935 (1980)), we conclude that it would be impractical and contrary to common sense to require the police to follow all possible leads in the course of an investigation to establish probable cause. We cannot agree with plaintiff that the detectives' failure to contact Dr. Caruso and Hong Lim is fatal to a finding of probable cause to arrest.

Plaintiff argues that the findings of the medical examiner, Dr. Jones, were based upon unsubstantiated information and that, therefore, a genuine issue of material fact exists as to whether defendants could have reasonably relied upon those findings to establish probable cause. Plaintiff asserts that E.X.'s "unsubstantiated, inconsistent allegations" were the only support Dr. Jones had for her opinion that the baby's death was caused by prematurity due to the premature rupture of membranes as a result of maternal blunt trauma.

We reject plaintiff's argument. The record reveals that Dr. Jones's conclusion regarding the cause of the baby's death was based on a combination of factors. At her deposition, Dr. Jones explained her conclusion as follows:

> "[T]here is indication in the medical records that mother complained of having blunt abdominal trauma during what amounted to a physical and verbal altercation with someone.
>
> And there was no other indication in the medical records at all of the mother having any other known cause for having premature rupture of the membranes.
>
> She did not have an infectious process going on or not

15

an incompetent cervix.

And in fact she required the use of Malanaria (phonetic) to tone her cervix, so the fetus could be delivered.

So, I -- basically what it does is it gives me both positive and negative information, which allows me to go ahead and come up with the cause of death."

The testimony of Dr. Jones refutes plaintiff's argument that Dr. Jones relied only upon E.X.'s statement in coming to an opinion as to the cause of death. As Dr. Jones explained, she also relied upon "negative" information: there was no other indication in the medical records of E.X. having any other known cause for having premature rupture of the membranes, such as an infectious process or an incompetent cervix. Moreover, as defendants note in their brief, "the detectives were not required to second guess the medical examiner's expertise and analyze whether her opinion was sound -- as far as they were aware, Dr. Jones's conclusion legitimately confirmed E.X.'s account." Plaintiff's argument fails.

Next, plaintiff argues that a genuine issue of material fact exists as to whether his confession was illegally obtained. He maintains that his requests to speak with a lawyer while in custody were denied, that defendants told him if he did not give a statement consistent with E.X.'s he would go to prison for 40 to 45 years, that he could go home if he gave a consistent statement, that he was presented with a statement that was pre-prepared, and that at the time he signed the statement, he was exhausted, confused, and otherwise broken down. Plaintiff asserts that because his confession was coerced, it was

"unable to be relied upon to establish probable cause." Plaintiff explains his argument as follows:

> "Given the inconsistent nature of [E.X.'s] allegations (from the initial allegation made at UIC Medical Center through her recantation), there exists a genuine issue of material fact as to whether the alleged incident of April 4, 1997, ever took place. *** Since there exists a genuine issue of material fact as to whether the incident ever took place, it is axiomatic that a genuine issue of material fact exists as to whether the confession was illegally obtained. Obviously, an illegally obtained confession can never be used to establish probable cause to charge an accused."

Plaintiff's argument is not persuasive. We have already concluded that, independent of plaintiff's confession, the detectives had ample probable cause at the time of arrest to believe he had committed a crime. We are mindful that E.X. eventually recanted. However, the existence of probable cause is measured based on the facts known to the officers at the time of the arrest. *Aboufariss*, 305 Ill. App. 3d at 1060, 1062-63. Moreover, as noted by defendants in their brief, the record does not indicate that the detectives engineered plaintiff's prosecution or prevented the assistant State's Attorney from exercising her independent discretion to proceed with charges and the prosecution. Accordingly, plaintiff's argument fails.

Finally, plaintiff argues that the fact that a grand jury indicted him does not require a

finding that probable cause existed to arrest and charge him. Plaintiff explains that he makes this argument because the "defendants will undoubtedly point to the fact that the Grand Jury issued an indictment against Plaintiff in an effort to support their case for the existence of probable cause." We need not address plaintiff's argument, as defendants have not made such a claim on appeal.

CONCLUSION

For the reasons explained above, we affirm the judgment of the circuit court. Summary judgment was properly granted for defendants and against plaintiff on the claims of malicious prosecution because there was no genuine issue of material fact as to whether probable cause existed at the time of the arrest and defendants were entitled to judgment as a matter of law.

Affirmed.

O'BRIEN, P.J., and GALLAGHER, J., concur.