2023 IL App (1st) 220525-U

THIRD DIVISION
September 6, 2023

No. 1-22-0525

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| DARRIN VAN BUREN, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | |
| | ) | No. 18 L 12889 |
| THE CITY OF CHICAGO; NATHAN POOLE, | ) | |
| Star # 20545; LAVARR KING, Star # 20297; and | ) | |
| PATRICK LOFTUS, Star # 20327, | ) | Honorable |
| | ) | Toya T. Harvey, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE REYES delivered the judgment of the court.
Justices McBride and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The judgment of the circuit court of Cook County granting summary judgment to a municipality and police officers on a malicious prosecution claim is affirmed.

¶ 2    Plaintiff Darrin Van Buren (Van Buren) filed a complaint for malicious prosecution in the circuit court of Cook County against the City of Chicago (City) and three police officers employed by the City – Nathan Poole (Poole), Lavarr King (King), and Patrick Loftus (Loftus). On appeal, Van Buren contends that the circuit court erred in granting summary judgment in favor of defendants.  For the reasons discussed below, we affirm.

¶ 3                              BACKGROUND

¶ 4                             *The Shooting*

¶ 5     On October 29, 2016, a shooting occurred at the Jamaican Jerk Villa restaurant in the 700 block of West 79th Street in Chicago.  The shooting was captured on a security camera inside the restaurant.  At approximately 8:30 p.m., an individual wearing a face mask entered the restaurant, walked to the front of a line of customers, and peered into the kitchen area.  He then pulled out a handgun and fired shots into the kitchen door and the dining room.  After exiting the restaurant, he fired once more through the front window.  Two individuals were shot: customer Brenda Wilson and employee Olive Edwards (Edwards), who was working in the kitchen.

¶ 6     Within minutes of the shooting, Chicago police officers arrived at the restaurant.  The record on appeal includes footage from the officers' body cameras.  As discussed further below, Michael Webster (Webster) – who worked as security at the restaurant – informed officers at the scene that the shooter was Edwards' former boyfriend, who was quickly identified as Van Buren.  On November 9, 2016, Van Buren was arrested; he was charged and subsequently indicted for the shooting.  Van Buren maintains that the shooter had a visible scar on his head, whereas he does not; the circuit court entered an order on May 17, 2018, directing the sheriff's office to shave his head.  Van Buren continued to be detained without bail until June 4, 2018, when the State ultimately nol-prossed the charges.

¶ 7                    *The Malicious Prosecution Complaint*

¶ 8     Van Buren filed a two-count complaint for malicious prosecution and intentional infliction of emotional distress (IIED) against defendants in the circuit court of Cook County in November 2018.  He alleged that the defendant officers reviewed the security footage of the shooting and knew that the shooter had a "plainly visible scar on the top of his head."  According

to Van Buren, the officers had observed him – both in person and through video monitoring – while he was in custody prior to being charged, and they knew that he did not have a scar.

¶ 9      In count I, Van Buren alleged that the defendant officers maliciously prosecuted him on false charges without probable cause. As the officers performed the challenged actions within the scope of their employment, Van Buren also sued the City under the doctrine of *respondeat superior.* In count II, Van Buren alleged that the officers – and the City by extension – engaged in "extreme and outrageous" conduct with the intent to inflict severe emotional distress or with knowledge of the high probability that the conduct would cause such distress.

¶ 10     In their answer to the complaint, defendants admitted that Officers Poole and King reviewed security footage prior to Van Buren's arrest but denied that they knew that the shooter had a "plainly visible scar on the top of his head." Defendants also filed affirmative defenses based on the Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/1-101 *et seq.* (West 2020)), a statutory scheme intended to protect local public entities and public employees from liability arising from the operation of government (745 ILCS 10/1-101.1 (West 2020)).

¶ 11     Defendants also filed a motion to dismiss count II of the complaint – the IIED claim – as time-barred pursuant to section 2-619(a)(5) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(5) (West 2020)). According to defendants, an IIED claim premised on an arrest and prosecution accrues at the time of the arrest. As the applicable limitations period was one year (745 ILCS 10/8-101(a) (West 2020)), defendants asserted that the action filed in November 2018 based on Van Buren's arrest in November 2016 was untimely. After briefing, the circuit court granted the motion to dismiss the IIED count.

¶ 12                    *The Motion for Summary Judgment*

¶ 13    Defendants filed a motion for summary judgment, arguing that Van Buren could not establish the first four of the five required elements of a malicious prosecution claim: (1) the commencement of criminal proceedings by defendants; (2) termination of the matter in favor of Van Buren; (3) the absence of probable cause for the proceedings; (4) the presence of malice; and (5) resulting damages.  The exhibits to the motion included the following.

¶ 14                         Nathan Poole Affidavit

¶ 15    In an affidavit, Officer Poole averred that he was assigned as the lead investigator at approximately 9:45 p.m. on the night of the shooting, October 29, 2016.  When he arrived at the restaurant, the two victims had already been transported to area hospitals.  Poole interviewed Webster, who stated that he "work[ed] security" at the restaurant.  Webster informed Poole that he was sitting near the front of the restaurant when an individual in a blue mask and coveralls walked past him to the front counter.  Webster indicated that he was not alarmed by the mask, as it was shortly before Halloween.  Although Webster did not know the shooter's name, he immediately recognized him as the ex-boyfriend of a restaurant employee, Olive Edwards.  Poole averred that Webster recognized Van Buren from his "body features" and the fact that Van Buren had repeatedly visited the restaurant to pick up Edwards.

¶ 16    According to Poole, Webster stated that he observed the masked individual remove a silver handgun from his waistband and fire approximately three shots into the door used by employees.  The shooter then walked to the front door of the restaurant and continued shooting.  Webster believed that the shooter fired at him since Webster recognized him.  The shooter exited the restaurant and fired the handgun through the front window, narrowly missing Webster.  Poole averred that Webster described Van Buren as approximately 5'7" or 5'8" and 165 or 175 pounds,

with a dark complexion. Webster relayed that Van Buren drove a white Cadillac.

¶ 17   Poole averred that he spoke with Edwards at the hospital at approximately 11:30 p.m. that evening. Edwards informed Poole that she was working in the kitchen at the time of the shooting. She did not view the shooting, but she took cover in the kitchen when she heard gunshots. She then felt a burning sensation in her left foot and realized she had been shot.

¶ 18   Edwards described her relationship with Van Buren to Poole. Edwards and Van Buren dated for one year; he was physically abusive when he drank. They broke up approximately three weeks prior to the shooting. She told Poole that Van Buren threatened to kill her if she left him. Edwards' last encounter with Van Buren was at 10:35 a.m. on the morning of the shooting. He drove up to the bus stop where Edwards was waiting and harassed her regarding "marriage, love, and sex." After Edwards rejected his request to reunite, Van Buren departed. According to Edwards, Van Buren drove a four-door white Cadillac and owned a silver revolver.

¶ 19   Poole averred that, on the day after the shooting, he interviewed the other victim, Brenda Wilson, and he recovered and reviewed the footage from the restaurant's security camera. He subsequently reviewed the body camera footage from officers who initially arrived at the scene, which confirmed that Webster identified Edwards' "ex" as the shooter.

¶ 20   On November 3, 2016, Webster was interviewed again at the police station, where he reported that he had recognized the shooter as Edwards' boyfriend. When presented with a photo array, Webster identified Van Buren as the shooter. On November 4, 2016, Poole reviewed the security footage with Edwards. She informed Poole that she recognized the shooter as her former boyfriend, Van Buren. According to Poole's affidavit, Edwards stated that she recognized Van Buren "from his small head, height, body build, broad ugly fingers, hair-cut with design, old scar on top of his head discovered while playing with his head when they were

together, and a limp in his left leg from an earlier skating accident."

¶ 21   Van Buren was arrested on November 9, 2016.  During separate recorded interviews with an assistant state's attorney on November 9 and 10, 2016, Webster and Edwards each identified Van Buren as the shooter depicted in the security video.  On November 10, 2016, a search warrant was executed on Van Buren's Cadillac; police recovered a gun lock and six live rounds of .357 ammunition.[1]

¶ 22   The recorded interviews, as well as the body camera footage and restaurant security footage, were attached as exhibits to Poole's affidavit and are included in the record on appeal.

¶ 23                    Preliminary Hearing Transcript

¶ 24   A transcript of a preliminary hearing held on November 22, 2016, was appended to the State's motion for summary judgment.  Brenda Wilson testified, in part, that the shooter was an African American man who fired a large silver handgun.  She was struck twice, and one of the bullets was permanently lodged in her back.

¶ 25   Edwards testified, in part, that Van Buren had previously tried to kick down her door and had threatened to hurt her if she left him.  She also testified regarding their conversation on the morning of the shooting, wherein she indicated that she would not marry him.  Immediately after the shooting, Webster told Edwards, "That's your dude," *i.e.*, the shooter was her boyfriend.  According to Edwards, Van Buren visited her at the restaurant on approximately six occasions.  When questioned regarding her identification of Van Buren as the shooter from the security video, Edwards testified that she recognized his limp and a scar on the side of his head.  She also recognized his silver revolver, which she had viewed previously on two occasions.

---

[1] While the record suggests that a revolver owned by Van Buren could fire the recovered ammunition, there does not appear to be any forensic evidence linking the firearm or the ammunition to the shooting at issue.

¶ 26    At the conclusion of the preliminary hearing, the circuit court entered a finding of probable cause and denied bail.

¶ 27                              Nathan Poole Deposition

¶ 28    A transcript of Poole's videotaped deposition from February 2021 was also appended to the motion for summary judgment. Poole testified that when he arrived at the Jamaican Jerk Villa restaurant after the shooting, he spoke with the responding officers and with Webster. Although another police officer had written in a report that Webster provided no details regarding the shooter, Webster provided details when interviewed by Poole. According to Poole, witnesses generally are more forthcoming with detectives than uniformed officers.

¶ 29    After conducting various interviews and otherwise investigating the shooting, Poole and his partner (King) signed a felony complaint form initiating the criminal proceedings against Van Buren on November 10, 2016. Poole testified before a grand jury on January 9, 2017.

¶ 30    During the deposition, Poole testified that Edwards told him that she discovered that Van Buren had a scar on his head when she was "playing" with his head. Although Poole testified that she never expressly stated that the scar was visible, she apparently recognized a scar on the shooter's head in the security video. Poole did not personally notice any scars on the shooter's head while viewing the video. Poole further testified that he did not specifically investigate whether Van Buren had a scar, as Edwards had otherwise identified Van Buren. As noted above, she informed Poole that she recognized Van Buren as the shooter based on his limp, his small head, his "ugly" fingers, and other physical characteristics.

¶ 31    Poole also testified that an evidence technician had recovered the mask on the night of the shooting, but forensic testing did not link the mask to Van Buren.

¶ 32    Defense counsel questioned Poole regarding the dismissal of charges against Van Buren

after the circuit court had granted the State's request for an order to shave Van Buren's head. When presented with a photograph of Van Buren's shaved head, Poole noted that the top of his head, but not the sides, had been shaven.

¶ 33                                    Lavarr King Deposition

¶ 34    The transcript of the deposition of Lavarr King from February 2021 was also appended to the defendants' motion for summary judgment.  King, who was Poole's partner, had been a detective for 7 years and a Chicago police officer for 23 years at the time of the deposition.

¶ 35    King testified that he viewed the security video of the shooting on November 3, 2016, when he first became involved in the investigation.  When questioned regarding any "identifying characteristics" of the shooter, King responded that the shooter was an African American male who had short hair, wore a blue mask and an overcoat, and used a silver revolver.  King did not observe any scars on the shooter in the video footage, but he did notice "something on his head" which "appeared to kind of leave as he changed his direction."

¶ 36    Although King was aware that Edwards stated that Van Buren had a scar on his head, he did not check for a scar when Van Buren was arrested.  King testified he "wasn't looking for anything," as Van Buren had already been identified by Webster and Edwards.  King recalled that Edwards "knew that that was him" based on the shooter's head, hands, and distinctive gait. When King inquired regarding his limp, Van Buren responded that he had arthritis.

¶ 37    Van Buren's counsel asked why Edwards did not sign the complaint.  King explained that Edwards was not present when the charges were approved and that it was not the practice of the Chicago police department to call in a victim to sign a complaint.  King expressed frustration regarding the "Bozo" head shave performed on Van Buren, *i.e.*, the shave of the top of his head but not the sides.  King testified that all of the investigatory materials were provided to the State,

and he appeared to opine that the State should not have dropped the charges against Van Buren.

¶ 38                             Patrick Loftus Affidavit

¶ 39    In an affidavit, Officer Patrick Loftus averred that he was *not* assigned to investigate the shooting on October 29, 2016. On November 9, 2016, when Van Buren was brought to the police station pursuant to an investigative alert, Loftus was notified by one of the arresting officers. Loftus then either contacted or attempted to contact the detective who issued the alert to notify the detective that Van Buren was in custody. Loftus also compiled the investigative file pursuant to a subpoena and forwarded it to the State's Attorney's Office on November 21, 2016.

¶ 40    Loftus averred that he did not have other involvement in the case, *e.g.*, he did not speak with Van Buren, perform any investigation, prepare any reports, or sign any criminal complaint.

¶ 41                             Darrin Van Buren Deposition

¶ 42    Van Buren testified he met Edwards in 2015 and they dated "on and off" for one or two years; he was also dating another woman during that time. He had been to the Jamaican Jerk Villa restaurant on more than 10 but less than 50 occasions. When questioned regarding certain incidents with Edwards, Van Buren denied ever stalking, threatening, or otherwise abusing her. He acknowledged that he owned a gray handgun which he had shown to Edwards but denied ever pointing the weapon at her. Van Buren also indicated that he owned a white Cadillac. He denied having a scar on his head.

¶ 43    Van Buren testified that he drove Edwards to work on the morning of the shooting. According to Van Buren, Edwards telephoned him from the emergency room after the shooting and stated "baby, they shot me." He testified that Edwards never told him that she thought he shot her. When questioned regarding his whereabouts on the night of the shooting, Van Buren testified that he was drunk in a park with "buddies," none of whom he could name.

¶ 44                    *Briefing and Ruling on Summary Judgment Motion*

¶ 45    In his response to the motion for summary judgment, Van Buren argued that Poole and King[2] maliciously caused him to be arrested and jailed for 19 months for a crime which he did not commit.  Van Buren noted that one of the responding officers prepared an incident report wherein the officer stated that Webster – the security person at the restaurant – offered no details regarding the shooter other than that he was wearing a blue mask and coveralls.  Van Buren also maintained that Officers Poole and King failed to verify whether he had a scar on his head, despite their review of the restaurant's security footage, where the shooter's scar was "visible." Van Buren further asserted that the incident report listed the shooter's height as between 6' and 6'2", whereas Poole was aware that Van Buren's height was 5'7".

¶ 46    According to Van Buren, Poole provided "false, inaccurate and/or deliberately misleading testimony" to the grand jury; his grand jury testimony was an attachment to the response.  Van Buren noted that Poole and King – and not Olive Edwards – signed the felony complaints.  Van Buren also observed that one of the complaints "falsely stated" that Van Buren lacked a valid Firearm Owner's Identification (FOID) card; this count was later dropped.

¶ 47    In their reply, defendants characterized any purported discrepancy relating to the incident report as "immaterial," given that police bodycam footage revealed that Webster had informed the responding officers that the shooter was Edwards' boyfriend.  Defendants further noted that neither Poole nor King "knew" that the shooter had a scar – let alone a "huge" and "visible" scar – contrary to Van Buren's contention.  According to defendants, any malicious prosecution claim based on the dropped FOID-related charge was time-barred.  Finally, defendants contended that Poole's grand jury testimony was truthful, that he was not required to volunteer "exculpatory"

---

[2] Van Buren's response did not reference Officer Loftus.

information, and that, in any event, "grand jury witnesses enjoy absolute immunity" from malicious prosecution claims.

¶ 48    Following arguments, the circuit court entered an order on November 2, 2021, granting defendants' motion for summary judgment. The circuit court found no material issue of fact regarding the absence of two of the required elements of a malicious prosecution claim: malice and probable cause.

¶ 49    Van Buren filed a motion for reconsideration, contending, in part, that the court did not consider the "grossly negligent conduct" of the defendant officers when finding that no issue of material fact existed as to the absence of probable cause for the proceedings. According to Van Buren, the officers "readily admit that they did not verify any of the facts that supported their supposed honest belief for probable cause." Defendants responded, in part, that the evidence established probable cause as a matter of law, *e.g.*, the separate and consistent identification of Van Buren as the shooter by both Edwards and Webster. The circuit court denied the motion to reconsider, and Van Buren filed this timely appeal.

¶ 50                                  ANALYSIS

¶ 51    Van Buren contends on appeal that the circuit court erred in granting summary judgment in favor of defendants. Prior to addressing his arguments, we note that the issues have been narrowed in two respects. First, our review is limited to the malicious prosecution claim, as Van Buren's IIED claim was dismissed as time-barred and his briefs solely address the malicious prosecution claim. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (noting that "[p]oints not argued are forfeited"). Second, although the malicious prosecution claim was filed against three officers – Poole, King, and Loftus – neither Van Buren's response to the summary judgment motion nor his briefs on appeal address any claims specifically against Loftus. Such arguments

11

are thus forfeited. *Id.* We begin our analysis with a discussion of summary judgment principles.

¶ 52                                    *Summary Judgment*

¶ 53    The purpose of summary judgment is not to try an issue of fact but to determine whether

an issue of fact exists. *Monson v. City of Danville*, 2018 IL 122486, ¶ 12. Summary judgment is

appropriate where "the pleadings, depositions, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2020).

" 'A genuine issue of material fact precluding summary judgment exists where the material facts

are disputed, or, if the material facts are undisputed, reasonable persons might draw different

inferences from the undisputed facts.' " *Monson*, 2018 IL 122486, ¶ 12 (quoting *Adames v.

Sheahan*, 233 Ill. 2d 276, 296 (2009)). The court must construe the evidence in the record

strictly against the movant (*id.*), and "unsupported conclusions, opinions, or speculation are

insufficient to raise a genuine issue of material fact" (*Valfer v. Evanston Northwestern

Healthcare*, 2016 IL 119220, ¶ 20). Although summary judgment has been called a "drastic

measure," it is an appropriate tool to employ in the expeditious disposition of a lawsuit where the

right of the movant is clear and free from doubt. *Suburban Real Estate Services, Inc. v. Carlson*,

2022 IL 126935, ¶ 15; *Aalbers v. LaSalle Hotel Properties*, 2022 IL App (1st) 210494, ¶ 15.

¶ 54    On appeal from an order granting summary judgment, the reviewing court must consider

whether the existence of a genuine issue of material fact should have precluded the dismissal or,

absent such an issue of fact, whether summary judgment is proper as a matter of law. *Monson*,

2018 IL 122486, ¶ 12. Our review of the trial court's grant of summary judgment is *de novo*.

*Suburban Real Estate Services*, 2022 IL 126935, ¶ 15. We may affirm the grant of summary

judgment on any basis in the record, regardless of whether the circuit court's reasoning was

correct. *Sang Ken Kim v. City of Chicago*, 368 Ill. App. 3d 648, 653 (2006).

¶ 55                                    *Malicious Prosecution Claim*

¶ 56    Van Buren argues that the circuit court erred in granting summary judgment in favor of defendants on his malicious prosecution claim. A malicious prosecution action is a civil tort initiated by a plaintiff for the recovery of damages which have proximately resulted to a " 'person, property or reputation' " from a previously unsuccessful criminal or civil proceeding, which was prosecuted with malice and without probable cause. *Beaman v. Freesmeyer*, 2019 IL 122654, ¶ 23 (quoting *Freides v. Sani-Mode Manufacturing Co.*, 33 Ill. 2d 291, 295 (1965)).

¶ 57    To state a cause of action for malicious prosecution, the plaintiff must prove five elements: (1) the commencement or continuation of an original civil or criminal judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages to the plaintiff. *Id.* ¶ 26. Accord *Swick v. Liautaud*, 169 Ill. 2d 504, 512 (1996).

¶ 58    Our supreme court has long recognized that actions for malicious prosecution are disfavored. *Beaman*, 2019 IL 122654, ¶ 24. See also *Holt v. City of Chicago*, 2022 IL App (1st) 220400, ¶ 67 (noting that "[p]ublic policy encourages the exposure of crime and disfavors malicious prosecution suits"). An action for malicious prosecution is subject to more stringent limitations than other tort actions and will be permitted only when all the requirements for maintaining an action have been satisfied. *Beaman*, 2019 IL 122654, ¶ 25. The absence of any of the five elements bars a plaintiff's malicious prosecution claim. *Beaman v. Freesmeyer*, 2021 IL 125617, ¶ 74; *Beaman*, 2019 IL 122654, ¶ 26; *Swick*, 169 Ill. 2d at 512.

¶ 59                                    *Absence of Probable Cause*

¶ 60    "Lack of probable cause for instituting the original proceedings is an indispensable

element of an action for malicious prosecution." *Beaman*, 2021 IL 125617, ¶ 116. Accord

*Turner v. City of Chicago*, 91 Ill. App. 3d 931, 934 (1980) (noting that the presence of probable

cause "constitutes an absolute bar to an action for malicious prosecution"). Probable cause is

defined as a state of facts that would lead a reasonably cautious individual to believe, or to

entertain a strong and honest suspicion, that the arrested person committed the charged offense.

*Beaman*, 2021 IL 125617, ¶ 116. "In the context of an action for malicious prosecution, the

assessment of probable cause depends on the totality of the circumstances existing when

defendants commenced the prosecution." *Id.* ¶ 117.

¶ 61    "A reasonable ground for belief of an accused's guilt may be based on information from

other persons as well as on personal knowledge." *Holt*, 2022 IL App (1st) 220400, ¶ 68. In this

case, Poole was informed by both Edwards and Webster that Van Buren was the shooter.

Webster was familiar with Van Buren's appearance, as he was a regular visitor to the restaurant

where Webster and Edwards were employed. After dating for one year, Edwards was

knowledgeable regarding Van Buren's appearance and demeanor. Upon reviewing the security

footage of the shooting, she readily recognized his physical features, including his small head,

his body build, his "ugly fingers," a scar on his head, and his limp. Edwards also indicated that

the handgun used in the shooting appeared similar to a handgun owned by Van Buren.

¶ 62    When the victim of the crime supplies the police with the information forming probable

cause, there is a presumption that the information provided is inherently reliable. *Holt*, 2022 IL

App (1st) 220400, ¶ 68; *Sang Ken Kim*, 368 Ill. App. 3d at 655. The reports of Webster and

Edwards alone supported the officers' reasonable belief to arrest Van Buren, as the information

from an eyewitness or a victim of a crime is entitled to particularly great weight in evaluating its

reliability. *Holt*, 2022 IL App (1st) 220400, ¶ 69. A police officer is entitled to accept a report if

it is not so incredible as to make the officer's belief that the plaintiff committed the crime to be unreasonable. *Id.* ¶ 80.[3] In this case, the officers' belief that Van Buren committed the shooting was not incredible or unreasonable in any respect. Not only did Webster and Edwards identify Van Buren as the shooter, but Edwards also described past physical abuse in their relationship and their contentious exchange on the morning of the shooting. These facts – coupled with the security footage revealing that the shooter aimed and shot through the door into the kitchen where Edwards was working – support the presence of probable cause.

¶ 63    Van Buren contends that the shooter bore a scar on his head, but that Van Buren did not. According to Van Buren, the officers failed to "conduct a minimal investigation" by not verifying whether he had a scar. We reject this contention. Given the detailed and consistent identifications of Van Buren as the shooter by both Webster and Edwards, the arrest and initiation of charges against defendant by the officers was justified. Illinois courts have consistently found that it is not necessary to verify the correctness of each item of information; it is sufficient to act with reasonable caution and prudence. *Sang Ken Kim*, 368 Ill. App. 3d at 655; *Turner*, 91 Ill. App. 3d at 935. Even if we assume that the officers erred in not taking such a step (which we do not), a "mistake or error that is not grossly negligent will not affect the question of probable cause in an action for malicious prosecution when there is an honest belief by the complainant that the accused is probably guilty of the offense." *Beaman*, 2021 IL 125617, ¶ 116. Accord *Holt*, 2022 IL App (1st) 220400, ¶ 68.

¶ 64    We are also unpersuaded by Van Buren's arguments regarding other purported deficiencies in the investigative process. For example, Van Buren contends that there were

---

[3] We further note that Van Buren's grand jury indictment is *prima facie* evidence of probable cause for purposes of a malicious prosecution claim. See *Beaman*, 2021 IL 125617, ¶ 117; *Holt*, 2022 IL App (1st) 220400, ¶ 77 (same).

inconsistencies in the descriptions of the shooter's height and Van Buren's height. We observe, however, that Van Buren has inconsistently described his own height, *e.g.*, he testified during his deposition that he is 5'10½" but now maintains that he is 5'7". Van Buren also claims that the officers should have conducted a live lineup. We note, however, that both Webster and Edwards knew Van Buren prior to the shooting, and thus it was not necessary to check whether they could recognize him. In any event, both Webster and Edwards identified defendant in a photo array. Van Buren further contends that the detective "falsely stated in the felony complaint" that he did not have a valid FOID card. This charge was a misdemeanor charge (see 430 ILCS 65/14(e) (West 2016)) which was nol-prossed by the State at the beginning of Van Buren's preliminary hearing. As such, it was not "instrumental in the commencement or continuation of his criminal prosecution." *Beaman*, 2021 IL 125617, ¶ 88.

¶ 65    Based on the information they knew at the time of Van Buren's arrest, defendants held an objectively reasonable belief that Van Buren had committed the shooting. We find that there is no genuine issue of material fact regarding the existence of probable cause in this case, and therefore, we also find that the circuit court acted properly in granting defendants' motion for summary judgment on the allegations of malicious prosecution. See *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008) (noting that summary judgment for the defendant is proper if the plaintiff fails to establish any elements of the cause of action); *Holt*, 2022 IL App (1st) 220400, ¶ 68 (providing that "[i]f it appears that there was probable cause to institute the proceedings, the action for malicious prosecution fails").

¶ 66                                   CONCLUSION

¶ 67    The judgment of the circuit court of Cook County is affirmed in its entirety.

¶ 68    Affirmed.